Lynn A. JENKINS, Plaintiff
and Appellant,

v.

Karl G. SWAN, et al., Defendants
and Respondents.

No. 17566.

Supreme Court of Utah.

Nov. 10, 1983.

Thomas S. Taylor, Provo, for plaintiff and appellant.

David L. Wilkinson, Atty. Gen., Salt Lake City, William Evans, Asst. Atty. Gen., Ted Cannon, Salt Lake County Atty., Bill Thomas Peters, Deputy S.L. Co. Atty., Felshaw King, Clearfield, David L. Church and Michael T. McCoy, Bruce Findlay, Salt Lake City, Ron Elton, Tooele, for defendants and respondents.

DURHAM, Justice:

Plaintiff/appellant, Lynn A. Jenkins (Jenkins), has filed this multi-party and multi-faceted lawsuit which defies a simple and concise explanation. In a one division complaint directed to all defendants, Jenkins seeks a judgment concerning certain aspects of the educational system of the state of Utah and five of its school districts, and concerning the taxing practices of Salt Lake County and the state of Utah. Apparently none of the defendants considered it necessary to exercise their rights under Rule 12(e) of the Utah Rules of Civil Procedure to an ambiguous complaint. All the defendants, rather, proceeded under Rule 12(b) of the Utah Rules of Civil Procedure, to ask that the entire complaint be dismissed for, *inter alia,* a lack of jurisdiction because Jenkins lacked standing to press these claims, failure to state a claim upon which relief can be granted, failure to comply with the Utah governmental immunity statute, U.C.A., 1953, § 63–30–1 to –38 (1978 and Supp.1981 and Interim Supp. 1983), and the previous adjudication of the issues in similar suits filed by Jenkins.[1] In response to these motions, the district court dismissed Jenkins' complaint "as to all of the defendants" because: (1) Jenkins lacked standing, (2) Jenkins failed to comply with notice and undertaking requirements of the governmental immunity act, and (3) the matter was res judicata as "most issues" have already been decided by the Utah Supreme Court. On appeal, Jenkins asks that the district court's order of dismissal be reversed.

The first set of defendants which can be identified in Jenkins' complaint are those related to the Utah educational system. These individual defendants can be matched with their respective school systems as follows: defendant Swan is a teacher for the Tooele School District; defendants Curan and Burningham are teachers for the Davis School District; defendant Bishop is a teacher and defendant Alfor is a principal for the Ogden School District; and defendant LeFevere is Director of Personnel for the Weber School District. The Jordan School District, the State of Utah, Superintendent of Public Instruction Walter D. Talbot, and the Utah Educational Association are also defendants. Jenkins' complaint prays for judgment as follows:

1. A declaration that the local School Districts and the Utah Department of Public Instruction are prohibited from hiring Utah legislators during the term of their office or continuing such legislators as empolyees once they become members of legislature. Article V, Section 1 and Article VI, § 6 of the Utah State Constitution, state, respectively, (a) "no person charged with the exercise of the powers properly belonging to one of these departments [of the Utah government], shall exercise any functions appertaining to either of the others," and (b) that "[n]o person holding any public office of profit or trust under authority . . . of this State, shall be a member of the legislature."

2. A declaration that the educator-legislators named as individual defendants are in violation of Utah Code Ann. § 67–16 (1953) for failing to file a conflict of interest disclosure statement concerning monies allegedly received from the Utah Education Association during the time when the legislature is in session.

3. A permanent restraining order prohibiting the Utah Educational Association from paying, hiring, loaning or gifting educators-legislators during the term of their office as legislators.

1. *Jenkins v. Finlinson,* Utah, 607 P.2d 289 (1980); *Jenkins v. State,* Utah, 585 P.2d 442 (1978).

4. A declaration that the "Utah State Textbook Commission" and the mandatory use of textbook provisions of Utah law, § 53–13–2 and 53–13–10, U.C.A., 1953, is unconstitutional, since it is in violation of Article X, § 9 of the Utah State Constitution, which states: "Neither the Legislature nor the State Board of Education shall have power to prescribe textbooks to be used in the common schools."

The second category of issues addressed in Jenkins' complaint relates to taxation and certain expenditures of public funds. It appears that Jenkins' demand for relief is directed to the Salt Lake County Attorney, the Salt Lake County Commission, the Salt Lake County Treasurer, the State of Utah, the Utah Attorney General and the Utah Tax Commission. Jenkins filed a protest with his 1980 property taxes, which were paid in the amount of $807.89. He prays for the following relief:

1. A refund of his 1980 property tax.

2. An order to Salt Lake County to prepare, publish and update a list of all exempt taxable property, itemized by owner valuation and amount of tax forgiven;

3. A declaratory judgment that the funding of the Uniform State Public Education System by local property tax is unconstitutional as not providing for equal distribution of tax throughout the state and being a denial of equal protection.

4. A declaratory judgment that providing public property and public services to religious organizations which are exempt from the payment of property tax is in violation of Article 1, § 4 of the Utah State Constitution, which states: "The State shall make no law respecting an establishment of religion" and "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction or for the support of any ecclesiastical establishment."

I.

We consider first the question of whether Jenkins had standing to raise those issues concerning the service in the Utah Legislature of Utah educators. The threshold requirement that Jenkins have standing is equally applicable whether he seeks declaratory or injunctive relief. Injunctive relief is a traditional equitable remedy in the appropriate cases, but as with other common law remedies, the moving party must have standing to invoke the jurisdiction of the court. The same jurisdictional standard applies to declaratory judgments. The statutory creation of relief in the form of a declaratory judgment does not create a cause of action or grant jurisdiction to the court where it would not otherwise exist. The Utah Declaratory Judgment Statute merely authorizes a new form of relief, which in some cases will provide a fuller and more adequate remedy than that which existed under the common law. *Gray v. Defa*, 103 Utah 339, 135 P.2d 251 (1943).

We have previously held that four requirements must be satisfied before the district court can proceed in an action for declaratory judgment: "(1) there must be a justiciable controversy; (2) the interests of the parties must be adverse; (3) the parties seeking relief must have a legally protectible interest in the controversy; and (4) the issues between the parties must be ripe for judicial determination." *Jenkins v. Finlinson*, Utah, 607 P.2d 289 (1980) (citing *Baird v. State*, Utah, 574 P.2d 713 (1978)). *See also Main Parking Mall v. Salt Lake City Corp.*, Utah, 531 P.2d 866 (1975); *Lyon v. Bateman*, 119 Utah 434, 228 P.2d 818 (1951). Requirements (2) and (3) represent the traditional test for standing. Plaintiff must be able to show that he has suffered some distinct and palpable injury that gives him a personal stake in the outcome of the legal dispute. *See Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Stromquist v. Cokayne*, Utah, 646 P.2d 746 (1982); *Sears v. Ogden City*, Utah, 572 P.2d 1359 (1977); *Main Parking Mall*. It is generally insufficient for a

plaintiff to assert only a general interest he shares in common with members of the public at large. *See Stromquist; Baird v. State*, Utah, 574 P.2d 713 (1978). We will not entertain generalized grievances that are more appropriately directed to the legislative and executive branches of the state government.

Unlike the federal system, the judicial power of the state of Utah is not constitutionally restricted by the language of Article III of the United States Constitution requiring "cases" and "controversies," since no similar requirement exists in the Utah Constitution. We previously have held that "this Court may grant standing where matters of great public interest and societal impact are concerned." *Jenkins v. State*, Utah, 585 P.2d 442, 443 (1978) (footnote omitted). However, the requirement that the plaintiff have a personal stake in the outcome of a legal dispute is rooted in the historical and constitutional role of the judiciary in Utah.

Historically, the courts were an extension of the executive branch and were developed to resolve disputes between private parties, and between the government as a land owner and private parties concerning the use and ownership of land. With the advent of mercantilism, industrialization and urbanization, the courts became increasingly concerned with disputes over the regulation of economic activity by private contract, and injuries to individuals in their daily activities in a crowded and complex society. "[T]he liability of one individual to another under the law ... is a matter of private rights ... Private-rights disputes ... lie at the core of the historically recognized judicial power." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 2870–71, 73 L.Ed.2d 598 (1982) (citations omitted). The courts developed ways of identifying and categorizing particular grievances, techniques for the receipt of information, and principles for arriving at a resolution of these disputes. *See generally* T. Plucknett, *A Concise History of the Common Law* (5th ed. 1956). In the course of this development, the judiciary emerged as a governmental institution distinct from the executive. The identification of the judiciary as one of three separate and equal branches of government in our written state Constitution must be viewed in light of this historical development.

Inherent in the tripartite allocation of governmental powers is the historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums. The requirement that a plaintiff have a personal stake in the outcome of a dispute is intended to confine the courts to a role consistent with the separation of powers, and to limit the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process. *See Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The courts are most competent in the exercise of their function when they have a "concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). A plaintiff with a direct and personal stake in the outcome of a dispute will aid the court in its deliberations by fully developing all the material factual and legal issues in an effort to convince the court that the relief requested will redress the claimed injury.

Constitutionally, the courts have the dual obligation to apply statutory and common law principles to a particular dispute and to evaluate those principles against governing constitutional standards. The propriety of such action by the federal courts has been recognized since *Marbury v. Madison*, 5 U.S. 137 (1 Cranch 137) 2 L.Ed. 60 (1803), and this Court has recognized that it is the inherent role of the judiciary to interpret constitutional provisions. *See Matheson v. Ferry*, 641 P.2d 674 (1982); *Jenkins v. State*. In the proper discharge of their duty in this regard, the courts *must* necessarily defer on some issues to the other branches of state government. For example, the airing of generalized grievances

and the vindication of public rights are properly addressed to the legislature, a forum where freewheeling debate on broad issues of public policy is in order.

> To grant standing to a litigant, who cannot distinguish himself from all citizens, would be a significant inroad on the representative form of government, and cast the courts in the role of supervising the coordinate branches of government. It would convert the judiciary into an open forum for the resolution of political and ideological disputes about the performance of government.

*Baird v. State*, Utah, 574 P.2d 713, 717 (1978).

An overstepping of appropriate restraints on judicial review of such political and ideological disputes is not only constitutionally and historically inappropriate, but also unwise. Although the Utah judiciary is not life-tenured, the following observation is applicable:

> [R]epeated and essentially head-on confrontations between the life-tenured branch and representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches.

*United States v. Richardson*, 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

Therefore, despite our recognition of this Court's power to "grant standing where matters of great public interest and societal impact are concerned," this Court will not readily relieve a plaintiff of the salutory requirement of showing a real and personal interest in the dispute. In light of the historical, constitutional and practical considerations discussed above, we engage in a three-step inquiry in reviewing the question of a plaintiff's standing to sue. The first step in the inquiry will be directed to the traditional criteria of the plaintiff's personal stake in the controversy. One who is adversely affected by governmental actions has standing under this criterion. One who is not adversely affected has no standing. A mere allegation of an adverse impact is not sufficient. There must also be some causal relationship alleged between the injury to the plaintiff, the governmental actions and the relief requested. Because standing questions are usually raised prior to the introduction of any evidence, we will necessarily be required to make a judgment whether proof of such a causal relationship is difficult or impossible and whether the relief requested is substantially likely to redress the injury claimed. K. Davis, *Administrative Law Treatise* § 22.20 at 368–70 (1982 Supp.). If the plaintiff satisfies this requirement, he will be granted standing and no further inquiry is required.

If the plaintiff does not have standing under the first step, we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff. If there is no one, and if the issue is unlikely to be raised at all if the plaintiff is denied standing, this Court will grant standing. *See, e.g., State v. Lewis*, Alaska, 559 P.2d 630, 635 (1977). When standing is predicated on the assertion that the issues involve "great public interest and societal impact," we will retain our practical concern that the parties involved have the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions. The Court will deny standing when a plaintiff does not satisfy the first requirement of the analysis and there are potential plaintiffs with a more direct interest in the issues who can more adequately litigate the issues.

The third step in the analysis is to decide if the issues raised by the plaintiff are of sufficient public importance in and of themselves to grant him standing. The absence of a more appropriate plaintiff will not automatically justify granting standing to a particular plaintiff. This Court must still determine, on a case-by-case basis, that the issues are of sufficient weight, *see Jenkins v. Finlinson*, Utah, 607 P.2d 289 (1980),

and that they are not more properly addressed by the other branches of government. Constitutional and practical considerations will necessarily affect our decisions in cases where a plaintiff who lacks standing under step one nevertheless raises important public issues. These are matters to be more fully developed in the context of future cases.

■ In this case, Jenkins claims that he is bringing this complaint as a resident of the state of Utah and as a "citizen, taxpayer, registered voter and parent" who is a member of a class of persons with a joint or common right against the defendants. Jenkins is a resident of Salt Lake County and has paid taxes to that entity. Jenkins is not a resident of the Tooele, Davis, Ogden or Weber School Districts, the districts which employ the educators/legislators named as defendants in this action. Jenkins fails to make any allegations that he is a resident of the legislative districts from which these individuals were elected. His claimed personal stake in the issue of educators serving as legislators is that they vote on legislation which financially benefits them as employees of the education system and that this adversely affects Jenkins as a taxpayer.

Jenkins' mere reliance on his general status as a taxpayer and citizen does nothing to distinguish him from any member of the public at large with regard to this dispute. His challenge is extremely broad; he attacks the constitutionality of educators serving in the Utah legislature, but makes no claim of a *particularized* injury to himself by virtue of the claimed wrong. Absent some claim of specific injury which is causally related to the alleged illegal activity, Jenkins has not met the traditional standing test articulated in step one above.

Jenkins further requests that we grant him standing under the rationale that he raises questions of great public interest and societal impact. We need not address that issue. Since Jenkins' claim for standing on this issue is predicated solely on the grounds of its public importance, we will not grant him standing when the pleadings reveal other potential plaintiffs with a more direct interest in this particular question. Jenkins' interest as a resident of the state of Utah is certainly less direct than the interest of the residents of the school districts which employ these individuals or the legislative districts from which they were elected. We need not and do not decide here whether residents of those areas would have standing to bring this complaint. We do find, however, that Jenkins' interest is less direct than the interest of those living in the relevant school districts or legislative districts. Therefore, we will not invoke the standing doctrine of "great public interest and societal impact" to consider his request for standing.

■ We also hold that Jenkins lacks standing to present his claims that U.C.A., 1953, §§ 53–13–2 and 53–13–10 are unconstitutional. Section 53–13–10 provides that members of boards of education shall be guilty of a misdemeanor if those persons refuse or neglect "to enforce the use of textbooks adopted by the [Utah State Textbook] commission...." Jenkins does not allege that he is a member of a local board of education and therefore cannot contend that he is or is likely to be subject to prosecution under this code section. In the absence of any such personal adverse impact, Jenkins lacks standing to raise the issue of the constitutionality of the statute. *See Redwood Gym v. Salt Lake City Commission*, Utah, 624 P.2d 1138 (1981); *Cavaness v. Cox*, Utah, 598 P.2d 349 (1979). Section 53–13–2 states that use of the textbooks adopted by the state textbook commission "shall be mandatory in all districts and high schools of the state." Jenkins fails to allege that this mandate adversely affects him or his children, except insofar as it may inflict some kind of "spiritual" discomfort caused by the existence of a statute he believes is unconstitutional. This Court may not issue an advisory opinion on this question merely to relieve his discomfort. *See Redwood Gym* and *Baird*. Further, members of local boards of education constitute a class of potential plaintiffs with a more direct interest in this question

than Jenkins, and, therefore, we will not address the question of whether Jenkins should be granted standing because of the alleged public importance of the issues involved.

■■■ Jenkins also requests that this Court enter an order directing the "educator-legislators" to file a conflict of interest disclosure statement concerning money allegedly received from the Utah Education Association. U.C.A., 1953, § 67–16–12 declares it a misdemeanor for a "public officer or public employee [to] knowingly and intentionally" violate the statute. The statute does not provide Jenkins with standing to act as a private attorney general in the enforcement of this statute. This Court will not presume to order these defendants to do that which they are already required to do by statute, if in fact the statute even applies to legislators.

■■■ Jenkins further requests this Court to permanently restrain the Utah Education Association from providing gifts, loans and other financial support to "educator-legislators." U.C.A., 1953, § 67–16–10 states that "[n]o person shall induce or seek to induce any public officer or public employee to violate any of the provisions of this act." The appropriate parties to initiate any action concerning violations of this statute are in the executive and legislative branches. Jenkins' position in this situation is identical to that of the citizenry at large, and therefore he lacks standing to pursue this cause of action.

## II.

In the introductory portion of this opinion, we outlined the relief sought by Jenkins in connection with payment of his 1980 property taxes. Apparently these claims, as well as those discussed above, were dismissed by the district court on the basis that Jenkins lacked standing, that he failed to comply with the procedural requirements of the statutes on governmental immunity, and that the doctrine of res judicata applied. Unlike the issues concerning educators in the legislature, none of the questions concerning taxation and expenditures raised by Jenkins appear to have been previously addressed to the district court or to this Court. Therefore, the doctrine of res judicata does not apply. Thus, we must review the district court's dismissal on the issues of standing and the applicability of the Governmental Immunity Act.

## A.

Jenkins alleges that he paid $807.89 for property taxes in 1980. A copy of a Salt Lake County tax assessment form in that amount is appended to his petition along with a letter addressed to the Salt Lake County Treasurer. This letter advised that Jenkins' taxes had been paid by Prudential Federal Savings & Loan and that the payment of the tax was under protest. The letter is dated November 29, 1980, the date noted on the tax assessment forms as the deadline for payment of the 1980 property taxes. U.C.A., 1953, § 59–11–11 (Supp. 1981) provides that when a party deems a levy to be unlawful, "such party may pay under protest such tax ... and thereupon the party so paying or his legal representative may bring an action in the tax division of the appropriate district court against the officer to whom said tax or license was paid, or against the state, county, municipality or other taxing unit on whose behalf the same was collected, to recover said tax ... paid under protest." No particular form of protest is required, *Murdock v. Murdock*, 38 Utah 373, 113 P. 330 (1911), and in the absence of the creation of a tax court in the district in which the action is filed, the bringing of an action in the appropriate district court is deemed as being in compliance with § 59–11–11. *See* U.C.A., 1953, §§ 59–24–1 to –9 (Supp.1981 and Interim Supp.1983). For purposes of our review, we assume Jenkins' allegations that he paid his 1980 property taxes and filed the letter of protest appended to his petition are true.

■■■ The constitutionality or legality of a tax statute may be raised in an action that is properly filed pursuant to § 59–11–1 in the district court. *See State Tax Com-*

*mission v. Wright*, Utah, 596 P.2d 634 (1979). Therefore, Jenkins clearly has standing to demand a refund of his 1980 property tax based on his claim that the tax statute pursuant to which all or part of that tax was assessed is unconstitutional. Jenkins' specific claim is that the system of uniform funding of state public education by local property taxes is unconstitutional. We hold that Jenkins has standing to demand a refund of all or part of his 1980 property taxes based on his allegation of the unconstitutionality of this statutory scheme.

Jenkins also requests this Court to declare the providing of public property and public services to religious organizations, which are exempt by law from the payment of property taxes, unconstitutional under Art. 1, Sec. 4 of the Utah Constitution. This Court has long held that a taxpayer has standing to prosecute an action against municipalities and other political subdivisions of the state for illegal expenditures. In an early case involving expenditures for the construction of a water distribution system, we said:

> To the extent that the water rates are excessive his taxes are increased, and the mere fact that it increases in like proportion the taxes of all other taxpayers does not deprive him of the right to maintain an action to arrest the waste of public funds.

*Brummitt v. Ogden Waterworks Co.*, 33 Utah 289, 295–96, 93 P. 828, 831 (1908). *See also Tooele Building Association v. Tooele High School District*, 43 Utah 362, 134 P. 894 (1913).

We have also extended the taxpayer's right to sue concerning illegal use of public monies to include an action against the state. In *Lyon v. Bateman*, 119 Utah 434, 228 P.2d 818 (1951), we reviewed the various arguments for and against the grant of such a taxpayer right of action and concluded that it should be permitted in this state. "[A] taxpayer should be permitted to enjoin the unlawful expenditure of tax moneys in which he has a pecuniary interest, or to prevent increased levies for ille-

gal purposes." *Id.* at 441, 228 P.2d at 821. In arriving at this conclusion, we quoted with approval the following language of the Illinois Supreme Court:

> We have repeatedly held that taxpayers may resort to a court of equity to prevent the misapplication of public funds, and that this right is based upon the taxpayers' equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misappropriation.

*Id.* at 443, 228 P.2d at 823 (quoting *Fergus v. Russel*, 270 Ill. 304, 110 N.E. 130 (1915)).

■ In applying the foregoing authorities to this case, we note that Jenkins makes allegations concerning the limited amount of private property in the state of Utah subject to state taxation. He further alleges that because of the limited amount of property available for taxation and the unconstitutional expenditure of tax dollars on religious institutions which have large property holdings but pay no property tax, he must pay increased taxes as an owner of taxable private property. He has alleged that he is directly and adversely affected by this governmental action. We hold that these allegations give him standing under the test set out in Section I of this opinion. In arriving at this conclusion, we need not determine the extent of the adverse impact on Jenkins; we only conclude that he has alleged a direct adverse impact which may be subject to proof, and it is likely that if the governmental action is declared unconstitutional, the adverse impact on Jenkins will be relieved. We hold, therefore, that Jenkins has standing to raise his claim concerning the unconstitutional expenditure of public monies on tax exempt private property held by religious organizations as part of his claim filed under U.C.A., 1953, § 59–11–11 (Supp.1981).

### B.

The motions of the defendants to dismiss Jenkins' entire complaint were granted on the basis that he failed to comply with the Utah Governmental Immunity Act. *See* U.C.A., 1953, § 63–30–1 to –38 (1978 &

Supp.1981 & Interim Supp.1983). We need only address this issue in connection with Jenkins' claim for the return of his property tax under § 59–11–11 as those are the only causes of action concerning which we have found Jenkins to have standing.

■ The district court found that Jenkins had failed to comply with the notice and undertaking requirements of the Governmental Immunity Act. Section 63–30–11 of that Act now provides that:

> [A]ny person having a claim for injury against a governmental entity or against an employee shall before maintaining an action for an act or omission occurring during the performance of his duties, within the scope of employment, or under color of authority, shall file a written notice of claim with such entity.

The word "injury" is defined in § 63–30–2(6) as "death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to his person, or estate, that would be actionable if inflicted by a private person or his agent." This definition of "injury" underscores the real concern of the governmental immunity act, namely that "a governmental entity, like individuals and private entities, should be liable for an injury inflicted by it." *Standiford v. Salt Lake City Corp.*, Utah, 605 P.2d 1230, 1234 (1980). *See also Thomas v. Clearfield City*, Utah, 642 P.2d 737 (1982). Jenkins' claim for an adjustment on his property taxes is neither an "injury" as defined in § 63–30–2(6) nor is it an "action under this act." Jenkins is prosecuting this action under a separate statutory authorization, § 59–11–11, which predates the enactment of the Governmental Immunity Act and which provides a distinct and separate basis for his claim against the government. The cause of action authorized under § 59–11–11 has its own notice provision in the form of the requirement to pay the tax under protest and has its own statute of limitation. *See* U.C.A., 1953, § 78–12–31. It is not governed by the notice or undertaking requirements in the Governmental Immunity Act.

Jenkins seeks equitable relief in the form of a declaratory judgment, in addition to a return of the property tax paid under protest. In *El Rancho Enterprises, Inc. v. Murray City Corp.*, Utah, 565 P.2d 778, 779 (1977), we said that the "common law exception to governmental immunity pertaining to equitable claims has long been recognized in this jurisdiction." We held that neither the passage of time nor the enactment of the Governmental Immunity Act has eroded that principle. *Id.* at 780. In 1978, the statutory section authorizing the suit in *El Rancho, see* U.C.A., 1953, § 10–7–77, was repealed and such claims are now covered exclusively by the Governmental Immunity Act. *See* Laws of Utah, 1978 ch. 27 § 12. These amendments do not undermine the continued viability of our holding in *El Rancho* that equitable claims of this nature for assessments made "without authority of law," are exempt from the notice requirements. *El Rancho*, at 780. Because this holding is predicated on the common law exception to governmental immunity for equitable claims, such claims are also exempt from the undertaking requirements of the Governmental Immunity Act.

■ We also note that Jenkins has requested this Court to order the Salt Lake County Tax Commission to create and maintain certain records concerning private property which is exempt from taxation. U.C.A.1953, § 59–11–2 provides that "[i]f on examination it is found that any officer ... has neglected or refused to perform any duty relating to revenue, the attorney general must prosecute the delinquent." Jenkins has failed to allege any statute or rule which imposes upon the tax commission a duty to maintain the records in the manner he requests. Even if there were such a duty, it is the responsibility of the attorney general to prosecute officers who have neglected to maintain records. Jenkins may of course seek any information which is relevant to his property tax claims through normal discovery procedures. Any disputes concerning the availability and relevancy of this information or the inconvenience of producing it in a specific

form would be appropriately addressed to the district court pursuant to its power to control discovery.

## III.

As we noted at the outset, the complaint in this case is complicated and confusing. Plaintiff has not clearly identified the specific parties to whom his allegations are directed. It is unfortunate that the defendants did not request a clarification of the complaint prior to proceeding with the motion to dismiss. We have attempted to organize the issues presented on appeal in order to address them. The district court's order of dismissal is reversed insofar as it dismissed the causes of action discussed in part II of this opinion, and affirmed in all other respects. This case is remanded to the district court for further proceedings consistent with this opinion.

HALL, C.J., and OAKS, J., concur.

WAHLQUIST, District Judge concurring and dissenting:

I dissent in part. I concur in the majority opinion except in the particular referred to below.

I have read the plaintiff/appellant's pleading and brief and have heard his argument. The plaintiff is not a member of the bar. He appears pro se. He evidences considerable academic training and intellectual control, but does not perform in accordance with the customs of the bar. He should not be rewarded with undue tolerance at the expense of the defendants for appearing pro se, nor should his communications be rejected because they are not ordinary in the court setting. What he is alleging in layman's terms is surprising, shocking and seems unbelievable; yet, he makes his allegations in sober seriousness.

His allegations, as I understand he intends them, are: there is an operating, grand conspiracy executed by a large segment of the executive branch of the government (involved in public education) to gain control over certain important functions of the legislative branch. He has filed one complaint that in pseudo-legalistic words embraces the breadth of his allegations. When studied in the context of independent paragraphs, it appears to be the allegations of totally independent and unrelated complaints, but taken as he seems to intend it, it is a related allegation. He alleges that the vast majority of the state public school teachers and many of the administrators are members of a group (Utah Education Association) (hereafter "UEA"). They are alleged to be united in the promotion of their own interests and in the shaping of the school system in accordance with their desires. The UEA allegedly secures funds from the group that it uses to finance the election of favorable legislative candidates, more particularly, teachers and administrators. During the legislative term, the UEA allegedly compensates the group for legislative and personal expenses, even lost wages, if any. He claims that the UEA makes it possible for the teacher/legislator to draw UEA benefits, teachers' salaries, and legislators' compensation, together with earned retirement benefits under both the teachers' retirement program and the legislators' retirement program simultaneously. Furthermore, all these duplicate wages and benefits continue, not only during the legislative term, but throughout the year, because of committee and legislative hearings. He also alleges that their power in the legislature far exceeds their number, because they are a highly organized, unregistered, unrestricted lobby group with the power to trade votes. They have access to the floor of the legislature, assured of access to all information in committee meetings and even in caucuses. The plaintiff alleges that this results in innumerable laws not possible but for this conspiracy. He alleges that the schools system is now primarily supported by funds provided by the state legislature, as opposed to the general intent that they be locally controlled by school boards. He alleges that the taxing system for the support of the school system results in favored treatment for certain areas, *e.g.*, that a property owner of a home located in Emery County

would pay only one-twentieth of the taxes that a resident in Salt Lake County would pay for equal ownership in a home. He further alleges that the legislature has created a textbook commission and empowered the state school superintendent to regulate not only public schools but also private schools, so that the textbooks and curriculum are controlled throughout the state in direct conflict with the state constitutional provisions that state that the legislature will not censure school books. He apparently is also convinced that the UEA has formed an alliance with church groups through parent groups, resulting in legislation and the administration of laws to make property tax-exempt on the basis that it is worship property or charitable property when, in fact, it may be used to promote the evangelistic endeavors of the church groups, their mutual welfare funds and their general activities involving church schools and recreation. He alleges that it is impossible for a taxpayer to even discover which properties are being treated as tax-exempt. He alleges that there is no adequate remedy in the system because it is extremely unlikely that any member of the UEA would bring a suit over a dispute concerning legislative wages or benefits and even more unlikely that any school board or school system would do so. He further alleges that so long as one cannot identify these tax-exempt properties or determine how they are treated, a general law suit involving them is not likely to reach the courts. He seems to be in agreement with the late Martin Luther King, who attempted to bring about social change or constitutional rulings by forcing controversies into court. *See Jenkins v. State,* Utah, 585 P.2d 442 (1978); *Jenkins v. Bishop,* Utah, 589 P.2d 770 (1980); *Jenkins v. Finlinson,* Utah, 607 P.2d 289 (1980). As a father of school children and a taxpayer in Salt Lake County, he presses for a judicial determination by paying his taxes under protest.

While the plaintiff seems to welcome judicial action on any portion of these allegations, it would be illogical not to look at his general overall allegation for whatever merit it might have. It is noted that the same general melody of his complaint can be heard periodically in the news media in connection with legislative and school board elections. In view of obvious public interest in the matter, I would not dismiss it as a grandiose, paranoic delusion.[1] I would return the case to the trial court with directions to hold an evidentiary hearing to determine to what extent his allegations may be supported by credible evidence; to hear what public concerns are present that would indicate jurisdiction should not be entertained; and to direct the trial judge to make a discretionary finding as to whether this plaintiff is entitled to have the courts entertain jurisdiction on the basis that he alleges an important public constitutional issue that is not likely to reach the courts by any other means and should be determined if the separation of powers are to be properly maintained. Such a determination would have to be made after paying due respect to the constitutional provisions that the legislature will be the judge of its own election controversies and that broad matters of a political nature are best determined in the legislative branch of government.

STEWART, J., dissents.

HOWE, J., does not participate herein.

WAHLQUIST, District Judge, sat.

---

1. It is evident the plaintiff/appellant has taken instruction from both *Jenkins v. State, supra,* and *Jenkins v. Bishop, supra.* He now aims directly at the issues, wants an evidentiary hearing and tactfully reminds the court that in the past, individual justices have agreed and others implied that the issue is one of importance.