2013 UT App 7

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.B.,
A PERSON UNDER EIGHTEEN YEARS OF AGE

M.B.,

*Appellant,*
*v.*
STATE OF UTAH,

*Appellee.*

Opinion
No. 20120036-CA
Filed January 10, 2013

Third District Juvenile, Salt Lake Department
The Honorable Frederic M. Oddone
No. 1047739

David C. Cundick, Attorney for Appellant
John E. Swallow and John M. Peterson, Attorneys for Appellee
Martha Pierce, Guardian ad Litem

JUDGE CAROLYN B. MCHUGH authored this Opinion, in which
JUDGE J. FREDERIC VOROS JR. concurred. JUDGE JAMES Z. DAVIS
concurred, in part, and concurred in the result only, in part, with
opinion.

McHUGH, Judge:

¶1 M.B. (Mother) appeals from the juvenile court's order
terminating her parental rights with respect to her minor child, C.B.
In particular, Mother contests the juvenile court's denial of her

motion to stay termination proceedings pending an evaluation of her competency. We affirm in part and dismiss Mother's appeal in part.


BACKGROUND

¶2     On February 4, 2011, the Division of Child and Family Services (DCFS) took three-month-old C.B. into protective custody after residents of a homeless shelter reported that Mother had left him unattended and had tried to suffocate him. The verified petition asserted that "[t]he [DCFS] caseworker met with [Mother] and observed [Mother] to have an erratic thought process as she jumped from topic to topic and [Mother] appeared to be confused." After a shelter hearing, Mother stipulated to the shelter findings and C.B. was placed in the interim custody of DCFS. The juvenile court held an adjudication hearing on April 8, 2011, and found that Mother had neglected C.B. The court also ordered that Mother undergo a psychological evaluation and parenting assessment.

¶3     On May 10, 2011, the juvenile court held a disposition hearing at which the State proposed a Child and Family Plan for reunification services. At that time, Mother's trial counsel reported that he had concerns about whether he could effectively represent Mother because he was having difficulty communicating with her. Mother's trial counsel asked that Mother undergo a psychological assessment or, in the alternative, that he be permitted to withdraw. The State did not object to the request that the disposition hearing be continued so long as the child welfare permanency deadlines would not be stayed while the psychological evaluation was being completed. As a result, the juvenile court continued the disposition hearing pending the psychological assessment.

¶4     Because Mother was incarcerated on the date of the continued disposition hearing, the juvenile court again postponed the hearing. After being released, Mother failed to appear on the second rescheduled date, and the juvenile court ordered a third

continuance. Although Mother appeared for the disposition hearing on June 30, 2011, she still had not completed her psychological evaluation. The juvenile court again ordered that Mother undergo a psychological evaluation so that it could proceed with the disposition hearing, which was scheduled for August 9, 2011. On July 22, 2011, over two months after she was originally ordered to do so, Mother completed her psychological evaluation.

¶5    When Mother failed to appear at the August 9, 2011 disposition hearing, trial counsel again moved to withdraw on the ground that he had been unable to communicate with Mother since the prior hearing. The juvenile court granted trial counsel's motion to withdraw and ordered that further "reunification services should not be offered because aggravating circumstances exist." Thereafter, DCFS indicated its intent to pursue the termination of Mother's parental rights and the juvenile court reappointed trial counsel to represent Mother in those proceedings.

¶6    DCFS filed its petition to terminate Mother's parental rights on September 8, 2011. On October 25, 2011, the day set for the termination trial, Mother's trial counsel filed a motion to stay pending a determination of Mother's competency based on his concerns that Mother did not understand the nature of the proceedings and was unable to assist in her defense. The juvenile court continued the termination trial in order to allow for briefing and argument on the issue. Ultimately, the juvenile court denied the motion to stay the proceedings based on its conclusion that "[t]here is no authority or procedural rule for a competency evaluation of a parent to determine if a parent is competent to stand trial and indeed, incompetence is a ground for the termination of parental rights." The juvenile court also found that Mother had been effectively represented by her trial counsel and that the psychological evaluation indicated that Mother did not exhibit any "abnormal thought processes." As a result, the juvenile court ordered that the case proceed to trial.

¶7 After a termination trial was held on December 8, 2011, the juvenile court entered an order terminating Mother's parental rights with respect to C.B. In its findings of fact, the court noted that Mother had testified "coherently and clearly" at trial and that it did "not have any basis to find that [Mother was] psychologically impaired [at trial] or for any time during the past nine months that she [had] appeared before the [juvenile court]." Mother appeals from the juvenile court's decision.

## ISSUES AND STANDARDS OF REVIEW

¶8 Mother asserts that the juvenile court erred by not staying the termination proceedings in order to authorize a competency evaluation. In particular, she claims that the juvenile court violated her rights under the Utah Rules of Civil Procedure and her due process rights under the Utah and United States constitutions. The "interpretation of a rule of procedure is a question of law" that we review for correctness. *Ostler v. Buhler*, 1999 UT 99, ¶ 5, 989 P.2d 1073. "'Due process challenges are questions of law that we review applying a correction of error standard.'" *Certified Bldg. Maint. v. Labor Comm'n*, 2012 UT App 240, ¶ 17, 285 P.3d 831 (mem.) (quoting *Utah Auto Auction v. Labor Comm'n*, 2008 UT App 293, ¶ 9, 191 P.3d 1252).

## ANALYSIS

¶9 We first consider Mother's argument that she was entitled to a competency hearing under the relevant procedural rules and statutes governing competency in criminal cases. Because we conclude that the procedural rules governing juvenile court proceedings did not afford Mother a right to a competency hearing, we then consider Mother's due process claims. *Cf. Gardner v. State*, 2010 UT 46, ¶ 93, 234 P.3d 1115 (noting that it is an appellate court's

"obligation to avoid addressing constitutional issues unless required to do so" (citation and internal quotation marks omitted)).

## I. Procedural Rights

¶10 Mother first claims that the juvenile court was empowered under Utah court rules to stay the termination proceedings and order Mother to undergo a competency evaluation. Proceedings to terminate parental rights are governed by the Utah Rules of Juvenile Procedure and, to the extent not inconsistent with those rules, the Utah Rules of Civil Procedure. *See* Utah R. Juv. P. 2(a). Mother points us to rule 17 of the Utah Rules of Civil Procedure, which states, "An . . . incompetent person who is a party must appear either by a general guardian or by a guardian ad litem . . . ." *See* Utah R. Civ. P. 17(b). Mother first argues that rule 17 affords the juvenile court "the right to appoint a guardian ad litem for an incompetent party" and then contends that, by inference, the court "is certainly empowered with making the determination regarding whether or not a mother of a juvenile in a child welfare proceeding is competent once it has been raised." Although trial counsel did request a competency evaluation, there is nothing in the record to suggest that counsel also requested that a guardian be appointed for Mother. Furthermore, rule 17 contains no provision suggesting that a civil litigant must be competent in order for the case to proceed. Instead, rule 17 provides that through appointment of a guardian, the case may go forward while the litigant remains incompetent. *See* Utah R. Civ. P. 17(b). Nothing in rule 17 supports Mother's claim that she was entitled to a stay of the termination proceedings pending a determination of her competency.

¶11 Mother also relies on the statute governing issues of incompetency in criminal proceedings, which provides that an incompetent person cannot "be tried for a public offense," because an incompetent person does not "have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged" or the ability "to consult with his counsel and to participate in the proceedings against him

with a reasonable degree of rational understanding." *See* Utah Code Ann. §§ 77-15-1, -2 (LexisNexis 2012).[1] Unlike rule 17's treatment of a party to a civil proceeding, if a criminal defendant is found incompetent, the proceedings must be stayed until the defendant is found competent to stand trial. *See id.* § 77-15-6(1) (2012); *id.* § 77-15-1. We agree with the juvenile court that the focus of a criminal trial is quite different than that of a child welfare proceeding.

¶12     The "ultimate goal and purpose" of DCFS is "protecting children." *Id.* § 62A-4a-103(2)(b) (2011). In accordance with this goal, the Utah Code directs DCFS to, "when possible and appropriate, provide . . . family preservation services." *Id.* But in cases where "a child's welfare is endangered or reasonable efforts to maintain or reunify a child with his family have failed," DCFS "shall act in a timely fashion . . . to provide the child with a stable, permanent environment." *Id.* The Utah Code further provides statutory timelines for establishing permanency. *See id.* § 78A-6-312(9) (2012); *see also In re S.C.*, 1999 UT App 251, ¶ 13, 987 P.2d 611 (stressing the importance of courts "adher[ing] to the time restrictions imposed by law" for resolving child welfare cases); *cf. In re G.R.*, 2008 UT App 265, ¶ 3, 191 P.3d 1241 (per curiam) (explaining that the statutory time limit on reunification services suggests "that a person is not entitled to an indeterminate amount of time to resolve any mental health issues prior to the beginning of reunification services"). Not only is "[m]ental illness . . . not a defense to a parental termination action," it "may actually be evidence of unfitness." *In re G.R.*, 2008 UT App 265, ¶ 2 (citing Utah Code Ann. § 78-3a-408(2)(a) (LexisNexis Supp. 2007) (current version at *id.* § 78A-6-508(2)(a) (2012))). As the guardian ad litem observes in her brief, "[m]aking a claim of incompetence to stand trial comes close to conceding the very issue of parental competence" that is at issue in a termination proceeding. *See generally* Utah Code Ann. § 78A-6-

---

1.  Where the relevant provisions of the Utah Code have not changed, we cite the current version for the reader's convenience.

507(1)(c) (LexisNexis 2012) ("[T]he court may terminate all parental rights with respect to a parent if the court finds . . . that the parent is unfit or incompetent[.]"); *id.* § 78A-6-503(12) ("[I]f a parent is found, by reason of his conduct or condition, to be unfit or incompetent . . . , the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered."). In fact, "[t]here is a presumption that reunification services should not be provided to a parent if the court finds, by clear and convincing evidence, that . . . the parent is suffering from a mental illness of such magnitude that it renders the parent incapable of utilizing reunification services." *See id.* § 78A-6-312(21)(b).

¶13 Furthermore, our jurisprudence regarding competence in termination cases refutes the notion that there is any procedural or statutory requirement that a parent be competent to proceed. In *In re G.R.*, 2008 UT App 265, 191 P.3d 1241 (per curiam), a mother whose parental rights were terminated appealed on the ground that "the parental termination proceedings and her requirement to comply with the terms of her service plan should have been stayed pending resolution of her mental health issues." *Id.* ¶ 1. In rejecting the mother's claim, this court explained that "because mental illness can constitute evidence supporting a determination of unfitness, it cannot be used as a defense enabling a parent to stay termination proceedings." *Id.* ¶ 2 (citing Utah Code Ann. § 78-3a-408(2)(a) (LexisNexis Supp. 2007) (current version at *id.* § 78A-6-508(2)(a) (2012))). The *In re G.R.* court also relied on the Utah Legislature's adoption of "strict limits" on the amount of time in which reunification services are available, concluding that "a person is not entitled to an indeterminate amount of time to resolve any mental health issues prior to the beginning of reunification services." *Id.* ¶ 3 (citing Utah Code Ann. § 78-3a-312(4)(d) (LexisNexis Supp. 2007) (current version at *id.* § 78A-6-314(7) (2012))).

¶14 As a result, we agree with the juvenile court that the procedural and statutory framework governing child welfare

matters does not include the right to stay termination proceedings pending the evaluation of a parent's competency.[2] In particular, there is nothing in the rules or statutes that would permit the juvenile court to suspend the time limits for permanency due to the parent's mental illness. *See* Utah Code Ann. § 78A-6-314(7), (8)(a) (stating that reunification time may not be extended beyond one year unless "there has been substantial compliance with the child and family plan; reunification is probable . . . ; and . . . the extension is in the best interest of the minor").

## II. Due Process Rights

¶15    Even in the absence of a statutory or rule-based procedural method for staying the termination proceedings pending a competency evaluation, Mother contends that such a right is afforded by the Due Process Clause of the Fourteenth Amendment

---

2.  Mother does not challenge the reasonableness of the services DCFS provided in connection with the reunification plan. *See generally In re T.M.*, 2003 UT App 191, ¶ 13, 73 P.3d 959 ("'[I]n any case in which the [juvenile] court has directed [DCFS] to provide reunification services to a parent, the court must find that [DCFS] made reasonable efforts to provide those services before the court may terminate the parent's rights.'" (second, third, and fourth alterations in original) (quoting Utah Code Ann. § 78-3a-407(3)(a) (LexisNexis 2002) (current version at *id.* § 78A-6-507(3)(a) (2012)))). As a result, this opinion should not be construed as an impediment to making appropriate efforts to restore a parent to competence, where such may be accomplished as part of a reunification plan within the time allotted for reunification. *See generally* Utah Code Ann. § 78A-6-312(13)(a) (LexisNexis 2012) ("The time period for reunification services may not exceed 12 months from the date that the minor was initially removed from the minor's home, unless the period is extended under Subsection 78A-6-314(8)[, which allows additional time for reunification services if certain criteria are met].").

to the United States Constitution.[3] *See* U.S. Const. amend. XIV, § 1. She relies on our pronouncement in *In re W.S.*, 939 P.2d 196 (Utah Ct. App. 1997), which held that "[d]ue process requires that a parent be given a meaningful opportunity to be heard by submitting testimony herself and by witnesses." *See id.* at 202 (citation and internal quotation marks omitted). According to Mother, if the juvenile court had ordered a competency evaluation and found her to be incompetent, "[t]here was a distinct possibility that [she] . . . could have become competent through mental services and/or proper medication," and thereby been able to participate meaningfully in the termination proceeding. Mother also contends that the juvenile court's determination that it did not have the authority to stay a termination trial to allow the parent's mental competency to be evaluated violates the due process rights of mentally incompetent parents who might be restored to competency in time to remedy the circumstances that led to the removal within the statutory deadlines.

A. Mother's Claim of Incompetency Was Not Supported by the Record.

¶16     Unlike in a criminal proceeding, there is no statute or rule requiring that child welfare proceedings be stayed upon a parent's request for a competency evaluation. *But see* Utah Code Ann. §§ 77-15-1, -5(1)(a) (LexisNexis 2012) (requiring that the court stay proceedings against a person charged with a public offense upon the filing of a petition raising issues of the defendant's competency to stand trial). Nevertheless, Mother contends that the due process concerns that require a criminal defendant to be mentally

---

3. Although Mother also lists the Utah Constitution's Due Process Clause as governing authority, she makes no "separate legal analysis and has not otherwise suggested a reason that warrants a distinct analytical treatment under the Utah Constitution." *See State v. Davis*, 972 P.2d 388, 392 (Utah 1998). Therefore, we do not consider her state constitutional due process claim. *See id.*

competent to stand trial are equally applicable to parental termination proceedings in the juvenile court. *Cf. State v. Arguelles*, 2003 UT 1, ¶ 47, 63 P.3d 731 ("It is well established that due process requires that a defendant be mentally competent to plead guilty and to stand trial."). We need not decide this issue because, even under the criminal due process standard, the juvenile court was not required to order a competency evaluation under the present facts.

¶17 In the absence of a statutory obligation to order a competency evaluation of a criminal defendant, due process requires the trial court to order such an evaluation only if the "observable, objective facts . . . raise[] a reasonable doubt as to the defendant's competence." *See State v. Young*, 780 P.2d 1233, 1238 (Utah 1989) (holding that the trial court did not violate the defendant's due process rights by failing to hold a competency hearing before proceeding with trial); *see also State v. Bailey*, 712 P.2d 281, 284–85 (Utah 1985) (holding that there was no statutory or due process right to a competency hearing where the defense did not file a petition requesting one and the record did not indicate that the defendant's mental condition had deteriorated since a psychiatric evaluation found him competent). Furthermore, in accepting a guilty plea, due process requires the trial court to hold a competency hearing on its own motion only "when there is a substantial question of possible doubt as to a defendant's competency at the time of the guilty plea." *Arguelles*, 2003 UT 1, ¶ 49 (citation and internal quotation marks omitted); *see also State v. Young*, 780 P.2d 1233, 1236 (Utah 1989) (explaining that *Bailey* held that "[a]n uncorroborated assertion of mental illness at trial was not sufficient to require a competency hearing" where there was no petition or evidence of mental illness). When determining whether there was a substantial question of possible doubt, "the focus should be on what the trial court did in light of what it then knew of the defendant." *See Young,* 780 P.2d at 1237 (citation omitted).

¶18 In this case, psychological testing and therapy were provided for in the reunification plan. In addition, the juvenile

court responded to concerns about Mother's mental health by ordering her to undergo a "full-scale clinical psychological evaluation." The results of that evaluation did not suggest that Mother was incompetent. Instead, the examiner determined that Mother was of average intelligence, "responded to [testing] in a manner that suggested she understood the directions," "should not experience any difficulty in comprehending and meeting the intellectual demands of her day-to-day and occupational functioning," and "possesses the cognitive ability to fully appreciate why she is involved with DCFS." The evaluator also observed that Mother was "oriented to person, place, situation, and time."

¶19    Furthermore, the juvenile court had its own opportunity to observe Mother's behavior during the proceedings. In reaching the decision to terminate Mother's parental rights, the juvenile court found her courtroom behavior appropriate, indicating that Mother "coherently described her efforts to obtain her general education degree and she explained that she is not working because she lacks the proper education to obtain a job. [Mother] testified coherently and clearly that she has an apartment in Salt Lake City . . . ." *Cf. Young*, 780 P.2d at 1238 (noting that the defendant's "testimony at trial was clear and coherent"). The juvenile court also indicated that trial counsel's frustration was "in part due to [Mother's] failure to come to meetings and failure to come to some court hearings, . . . but her behavior could just as well be from her lack of interest as is alleged in the State's petition as easily as it could [be] from any other factor." Based on what it then knew of Mother, the juvenile court concluded that it did "not have any basis to find that [Mother was] psychologically impaired [at trial] or for anytime during the past nine months that she [had] appeared before the Court." Under these circumstances, even assuming, without determining, that the due process constraints governing the nonstatutory right to a competency evaluation in a criminal trial applies equally to a parental termination, the juvenile court's refusal to order a competency evaluation did not violate Mother's due process rights. *Cf. Id*. (holding that isolated emotional distress did not mandate a

competency hearing where there was no indication that the defendant was unable to assist counsel).

B. Mother Lacks Standing to Challenge the Juvenile Court Procedures on Behalf of Incompetent Parents Who Might Be Restored to Competency.

¶20    Mother also raises a facial challenge, arguing that if the juvenile court procedures do not include a mechanism by which termination proceedings can be stayed pending the restoration of the parent's competency, those procedures violate due process. However, we have determined that Mother's claims of incompetence were not supported by the record. As a result, Mother lacks standing to advance this argument.

¶21    In *State v. Mace*, 921 P.2d 1372 (Utah 1996), the Utah Supreme Court considered an analogous situation. There, the defendant challenged Utah's statutory insanity defense, arguing that it "allow[ed] for the conviction of those who have the requisite mens rea, even though they may not appreciate the wrongfulness of their conduct or are unable to control their conduct." *Id.* at 1376 (citing Utah Code Ann. § 76-2-305(1) (Michie 1995) (current version at *id*. (LexisNexis 2012))). In particular, the defendant claimed that punishing this class of persons violated the federal and state constitutional prohibitions against cruel and unusual punishment. *See id.*; U.S. Const. amend. VIII; Utah Const. art. I, § 9. However, the supreme court refused to consider the defendant's constitutional challenge because "[t]hose facts are not present in this case, and . . . [the defendant] lacks standing to assert such a broad facial challenge." *Mace*, 921 P.2d at 1379. In reaching that conclusion, the *Mace* court applied a "three-step inquiry in reviewing the question of a complainant's standing to sue," which had been "previously outlined" in *Jenkins v. Swan*, 675 P.2d 1145 (Utah 1983). *See Mace*, 921 P.2d at 1379.

¶22    "The first step of the inquiry is directed to ascertaining the complainant's personal stake in the controversy" and considers

whether there is "'some causal relationship alleged between the injury to the [complainant], the governmental actions and the relief requested.'" *Id.* (alteration in original) (quoting *Jenkins*, 675 P.2d at 1150). If this requirement is met, the complainant has established standing. *Id.* Because the complainant could not satisfy the first step of the standing inquiry, the *Mace* court proceeded to the second step, which considers "whether anyone else would have a 'more direct interest in the issues who can more adequately litigate the issues.'" *Id.* (quoting *Jenkins*, 675 P.2d at 1150). The third step in the standing analysis applied in *Mace* was whether "the issues raised by the [complainant] are of sufficient public importance in and of themselves to grant . . . standing." *Id.* (alteration in original) (quoting *National Parks & Conservation Ass'n v. Board of State Lands*, 869 P.2d 909, 913 (Utah 1993)).

¶23    Ten years after *Mace*, in *Utah Chapter of the Sierra Club v. Utah Air Quality Board*, 2006 UT 74, 148 P.3d 960, the Utah Supreme Court refined the standing test because the "treatment of standing principles ha[d] become somewhat convoluted, leading to occasional missteps in their application." *Id.* ¶ 18. In *Sierra Club*, the court explained that a proper standing analysis involves a two-step process, which considers whether the party has standing under the traditional standing test and, if not, whether standing exists under an alternative standing test. *See id.* ¶¶ 18, 41. The traditional standing test, or the "'distinct and palpable injury'" requirement, encompasses the first prong of the standing test that was articulated in *Jenkins* and applied in *Mace. See id.* ¶ 19 (quoting *Jenkins*, 675 P.2d at 1148); *Mace*, 921 P.2d at 1379. Even if a party cannot meet that traditional test, however, the party may have standing under the alternative standing test, which assesses the appropriateness of the party to raise the particular issue and the likelihood that it will be advanced if the party is denied standing. *See Sierra Club*, 2006 UT 74, ¶ 41. While these concepts are included in the standing test discussed in *Jenkins*, the analysis now requires only that the plaintiff be an appropriate party, not the most appropriate party to raise the issue. *Id.* ¶ 36. Thus, under the modern standing test, multiple parties may have standing to raise

the same issue. *Id.* ¶ 37. But even if the party is an appropriate person to raise the issue, to qualify for alternative standing, the party must also establish that the relevant issues "'are of sufficient public importance in and of themselves' to warrant granting the party standing." *Id.* ¶ 39 (quoting *Jenkins*, 675 P.2d at 1150). Thus, we consider Mother's standing in light of the analogous situation in *Mace*, as refined by the standing test announced in *Sierra Club*.

¶24    We begin our traditional standing analysis by considering whether Mother has a "personal stake in the controversy." *See Mace*, 921 P.2d at 1379. In *Mace,* the supreme court concluded that the defendant had "no personal stake in his claim that the statutory scheme might punish people who are unable to appreciate the wrongfulness of their conduct" because the facts indicated that the defendant "did appreciate the wrongfulness of his conduct." *Id*. In particular, the clinical director of the Utah State Hospital's forensic unit testified that the defendant "'obviously had intent'" and "'obviously knew [that his conduct] was wrong.'" *See id.* at 1374–75. Thus, the supreme court concluded that the defendant did not satisfy the first prong of the standing test articulated in *Jenkins*. *See id.* at 1379; *Jenkins*, 675 P.2d at 1150.

¶25    The same conclusion is appropriate under the traditional standing test here. Mother has no personal stake in her claim that persons unable to understand the juvenile court proceedings or the requirements of the reunification plan due to mental incompetency have a constitutional right to a competency hearing, to a guardian, or to be restored to competency. Early in the proceedings, the juvenile court ordered that Mother undergo a psychological evaluation. The resulting report concluded that Mother "possesses the cognitive ability to fully appreciate why she is involved with DCFS" and that she "should not experience any difficulty in comprehending and meeting the intellectual demands of her day-to-day and occupational functioning." The juvenile court made similar observations based on its interaction with Mother and ultimately found that it did not have any basis to question her competence. As in *Mace*, the juvenile court's finding, based on the

available evidence, excluded Mother from the class of persons affected by the challenged conduct. *See* 921 P.2d at 1378–79.

¶26    Because Mother cannot satisfy the traditional standing inquiry, we proceed to the consideration of alternative standing. *See Sierra Club*, 2006 UT 74, ¶ 41. "To make this determination, the court must first ask whether the party is an appropriate party. If the party is not an appropriate party, the court's inquiry ends and standing is denied." *Id*. (citation omitted).

> [A] court addressing standing under the alternative test does not need to determine which party seeking to intervene is the *most* appropriate party in comparison to any other potential party, but rather needs to determine only which parties are, in fact, appropriate parties to a full and fair litigation of the dispute in question.

*Id*. ¶ 36.

¶27    In *Mace*, the supreme court concluded that persons suffering from mental illnesses which "made it impossible for them to appreciate the wrongfulness of their conduct" were better situated to pursue the constitutional challenge. *State v. Mace*, 921 P.2d 1372, 1379 (Utah 1996). The due process challenge advanced by Mother would also be more appropriately raised by parents whose mental incompetency prevents them from understanding the juvenile court proceedings but who could be restored to competency within the statutory time limits. However, because Mother need not be the most appropriate party to raise the challenge, we proceed to the second part of the alternative standing test to determine whether she is "asserting issues of sufficient public importance to balance the absence of the traditional standing criteria. If so, the party has standing." *See Sierra Club*, 2006 UT 74, ¶ 41 (citation omitted). Considering this issue in *Mace*, the supreme court concluded,

"Deciding the issue now would have no conceivable concrete benefit to anyone" because "the statutory scheme at issue here applies only to individual defendants and does not threaten to chill or generally infringe on the rights of others." *See* 921 P.2d at 1379. Likewise, Mother has no stake in the outcome of this broad constitutional issue and has not established any compelling reason to grant her alternative standing. Thus, we do not reach the merits of her due process challenge to the juvenile court procedures.

CONCLUSION

¶28    We affirm the juvenile court's determination that juvenile court procedures do not allow for the stay of termination proceedings pending a competency evaluation. Even assuming that the due process constraints of criminal trials are applicable to termination proceedings, an issue we do not decide, we hold that the juvenile court did not err in denying Mother's motion because her claim of incompetency was unsupported by the record. Finally, we dismiss Mother's general due process challenge to the juvenile court procedures because she does not have standing to advance that claim.

¶29    Affirmed, in part, and dismissed, in part.

———

DAVIS, Judge (concurring and concurring in result only):

¶30    I concur in the majority's analysis and conclusion as to Part I. However, I concur only in the result as to Part II because I do not think criminal cases relating to competency are applicable in this context and because I disagree with the majority's standing analysis.

¶31    I agree with the majority that we need not reach Mother's due process argument in light of the fact that psychological testing and the juvenile court's own observations indicated that Mother

was competent. However, I disagree with the majority's insinuation that the criminal standard, which requires a stay of the proceedings if a defendant is found to be incompetent, could potentially apply to a parental termination proceeding. While the general issue of whether Utah's juvenile procedures comply with constitutional due process requirements may be left for another day, I do not believe that the due process required in a parental termination proceeding is equal to that afforded criminal defendants.[4]

¶32    Although I recognize the jurisdictional implications of standing, I believe it is inappropriate in most cases to address an issue raised by none of the parties on appeal. Also, even if it were appropriate in this civil proceeding to rely on a criminal case to analyze standing to seek a separate competency determination, it is fundamentally illogical to require a determination of incompetence in order to establish standing to seek a determination of incompetence. Accordingly, I am untroubled by Mother's raising the issue both in the juvenile court and on appeal.

---

4. This point is aptly illustrated by the majority's analysis of Mother's statutory rights. *See supra* ¶¶ 11–12.