Jack Allen OLSON, et al., Plaintiffs and Respondents,

v.

SALT LAKE CITY SCHOOL DISTRICT, et al., Defendants and Appellants.

No. 19055.

Supreme Court of Utah.

Aug. 12, 1986.

---

7.  *See Home Owners' Loan Corp. v. Logan City,*   97 Utah 235, 239, 92 P.2d 346, 348 (1939).

James B. Lee, James M. Elegante and Byron W. Milstead, Salt Lake City, for defendants and appellants.

Dan S. Bushnell and David M. McConkie, Salt Lake City, for plaintiffs and respondents.

ZIMMERMAN, Justice:

This appeal arises from an order of the Tax Division of the Third Judicial District Court permanently enjoining appellants, Salt Lake City School District, its clerk and superintendent, and the Salt Lake City Board of Education as a body and as individuals (collectively referred to as the "District"), from utilizing monies held in a Salt Lake City School District line item reserve fund established to cover unexpected contingencies. The trial court held that the District exceeded its statutory authority by including the line item reserve fund in the budget for 1981–82, and the five preceding fiscal years when the District already had access to an undistributed reserve fund to cover unexpected contingencies, which was specifically authorized by section 53-20-2 of the Utah Code. U.C.A., 1953, § 53-20-2 (Repl.Vol. 5B, 1981, Supp.1985). We agree and affirm.

This suit was filed in July of 1981 by a number of individual plaintiffs and business entities who alleged that they were property owners and taxpayers in Salt Lake City. In addition, one of the plaintiffs is the Utah Taxpayers Association ("the Association"), a non-profit entity primarily composed of business persons and business entities interested in taxation issues. The lead plaintiff in this action, Jack Olson, is the chief executive of the Association; many of the named plaintiffs are members of the Association.[1]

---

1. The posture of this suit immediately raises questions of taxpayer standing. Although the Utah courts have substantial discretionary authority to confer standing upon appropriate parties because they are not constrained by the case or controversy requirements contained in the federal constitution, that authority is not unbounded. This Court will not issue advisory opinions; but if an appellant does not meet the traditional test of standing, that appellant may be granted standing if there is no more appropriate appellant and "the issue is unlikely to be raised at all if the [appellant] is denied standing." *Kennecott Corp. v. Salt Lake County,* 702 P.2d 451, 454 (Utah 1985), *accord Jenkins v.* *Swan,* 675 P.2d 1145, 1150–51 (Utah 1983). In appropriate cases, this Court may even grant standing where the issues are of "great public importance and ought to be judicially resolved." *Kennecott Corp. v. Salt Lake County,* 702 P.2d at 454.

In the past, this Court has granted taxpayers standing to challenge the actions of political subdivisions for illegal expenditures and to challenge the illegal use of public funds. *See, e.g., Brummitt v. Ogden Waterworks Co.,* 33 Utah 285, 295–96, 93 P. 828, 831 (1908); *Jenkins v. Swan,* 675 P.2d at 1152–53; *see also Lyon v. Bateman,* 119 Utah 434, 228 P.2d 818 (1951). This case is closely analogous to *Brummit* and

The complaint alleged that the District had improperly included within its annual budget two reserves to cover unexpected contingencies, the first specifically authorized by section 53–20–2 of the Code and the second created by the District of its own accord. Plaintiffs contended that the District had no authority to create the second reserve fund. They contended that the second reserve increased the total budget of the District each fiscal year, resulting in an unnecessarily high property tax mill levy. Plaintiffs sought an injunction to prevent the District from certifying the amount shown in its 1981–82 budget to the Board of County Commissioners for inclusion in the property tax levy. Initially, the district court issued a temporary restraining order; however, after a July 29, 1981, hearing on the matter, the order was dissolved and the matter was set for trial on the merits. Certain plaintiffs paid their 1981 property taxes under protest, and the complaint was later amended to include a request for a refund by these taxpayers.

The matter was submitted upon a stipulated record, and on January 20, 1983, the district court ruled for the plaintiffs. The court found that for each fiscal year from 1976–77 through 1981–82, the District had adopted a budget containing two reserves. The first was a funded "undistributed reserve" authorized by section 53–20–2 to meet unexpected contingencies not other-

wise provided for by specific accounts in the budget.[2] None of the funds in the undistributed reserve had ever been used. A second funded line item reserve was also included in each of these budgets, and its funds were used to meet unexpected contingencies not related to the line item for which it was budgeted.[3] The court concluded that as a matter of law, the District was entitled to maintain only the statutorily authorized undistributed reserve for unexpected contingencies. Accordingly, the court permanently enjoined the District from adopting a budget that included "any reserve, however designated, which serves to meet unexpected contingency expenditures not otherwise provided for by specific accounts in the budget, and which reserve is in addition to that reserve authorized by section 53–20–2, Utah Code Ann." The court also ordered the District to use the statutorily authorized reserve to meet unexpected contingencies. Finally, in an attempt to qualify its order for immediate appeal under Utah Rule of Civil Procedure 54(b), the court ordered that a final judgment be entered on the plaintiffs' claim for permanent injunctive relief and certified that there was no just reason to delay an appeal. However, the court expressly reserved ruling on the claim of some of the plaintiffs for a tax refund pending the outcome of this appeal.

*Jenkins* in which we granted taxpayers standing. We find that applying the general principles enunciated in the cases noted, individual taxpayers in Salt Lake City would be granted standing on the basis that there are no more likely appellants and the issue is otherwise unlikely to be raised.

Under the test for associational standing enunciated in *Utah Restaurant Association v. Davis County*, 709 P.2d 1159, 1162–63 (Utah 1985), the Utah Taxpayers Association had standing to sue on behalf of its members for declaratory and injunctive relief. Therefore, the inclusion of over one hundred individuals and businesses as plaintiffs in the trial action was unnecessary to resolve the legal issues initially presented. As noted *infra*, however, the complaint was subsequently amended to include a claim for a refund of taxes paid, which the Association could not maintain. According to *Utah Restaurant Association v. Davis*, 709 P.2d at 1163, in order to obtain a refund, the

individual taxpayers would have to be joined or the action would have to be prosecuted as a class action under Rule 23 of the Utah Rules of Civil Procedure.

2. Section 53–20–2 provides that the undistributed reserve was to be available for any unexpected contingencies except those arising out of negotiating or settling contract salary disputes with school district employees.

3. The non-statutory reserve was variously designated as "Salaries—Reserves—Teachers," "Salaries—Reserve," "Salaries—Unallocated," "Salaries—Other Expenses," and "Salaries—Other Expenditures." Funds in the reserve were actually used to cover increased electricity and fuel costs, school outings, student body activities, school supplies, retirement, insurance, garbage collection, professional meetings, grounds maintenance, and legal services.

Before this Court, the District seeks a reversal of the trial court's ruling and a dissolution of the permanent injunction. First, however, a jurisdictional issue must be addressed—whether the case was properly certified for appeal under Utah Rules of Civil Procedure 54(b).[4] The parties have not raised the issue and when the issue was broached by the Court at oral argument, neither side appeared eager to address it. *Cf. Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976). However, to ignore Rule 54(b) problems simply because the parties are anxious to have their case considered on the merits will only exacerbate the apparently widespread confusion surrounding Rule 54(b) practice. Although we have recently attempted to clarify the parameters of Rule 54(b), *see Pate v. Marathon Steel Co.,* 692 P.2d 765 (Utah 1984); *Lane v. Messer,* 689 P.2d 1333 (Utah 1984); *Williams v. State,* 716 P.2d 806 (Utah 1986), further comment seems necessary.

■ At the outset, we note that acquiescence of the parties is insufficient to confer jurisdiction and that a lack of jurisdiction can be raised at any time by either party or by the court. *See, e.g., Heath Tecna Corp. v. Sound Systems International, Inc.,* 588 P.2d 169, 170 (Utah 1978); *Utah Restaurant Association v. Davis County,* 709 P.2d 1159, 1160 (Utah 1985); *Kennedy v. New Era Industries, Inc.,* 600 P.2d 534, 534–35 (Utah 1979). In *Pate v. Marathon Steel,* we noted that a ruling is not appealable under Rule 54(b) unless three requirements are met: (i) there must be multiple claims or parties; (ii) the trial court must determine that there is "no just reason" to delay the appeal; and (iii) the judgment or order appealed from must be final, *i.e.,* it must wholly dispose of the claim or the party. *Id.,* 692 P.2d at 767–68; *accord Williams v. State,* 716 P.2d at 807.

■ As we noted in *Pate,* not every order is "final" and thus appealable under Rule 54(b). 692 P.2d at 767–68. The only orders that are "final" within the meaning of the rule are those that (i) are entered in cases where there are multiple parties or multiple claims for relief, and (ii) "wholly" dispose of one or more, "but fewer than all," of the claims or parties. 692 P.2d at 768. If an order meets both requirements of finality, the district court can then choose to certify it for immediate appeal on the ground that there is no just reason for delay. A district court cannot, however, make a non-final order appealable. An order is either final or it is not. The terminology used in describing it cannot change its fundamental character. *Id.,* n. 2; *see, e.g., Little v. Mitchell,* 604 P.2d 918 (Utah 1979); *cf. Wheeler Machinery v. Mountain States Mineral Enterprises, Inc.,* 696 F.2d 787, 789 (10th Cir.1983) (decided under Fed. R.Civ.P. 54(b)).

■ The order appealed from here is not final within the meaning of Rule 54(b), except as to the Utah Taxpayers Association. Although plaintiffs prayed for several different kinds of relief, they asserted but one legal claim: that the District's use of the line item reserve to cover the costs of unexpected contingencies not otherwise provided for in the budget was unlawful. Based on this single claim, plaintiffs sought declaratory, injunctive, and monetary relief. The final disposition of a claim for relief necessarily includes a determination of the remedy to which the claimant is entitled. As the United States Court of Appeals for the Second Circuit has said in considering the federal analogue to our Rule 54(b),

"Finality," for purposes of the application of Rule 54(b), is generally understood as that degree of finality required to meet the appealability requirements of 28 U.S.C. § 1291. [Citations omitted.] This, in turn, is usually defined as a judgment "which ends the litigation on

---

4. Rule 54(b) provides in relevant part:
   [W]hen more than one claim for relief is presented in an action ... and/or when multiple parties are involved, the court may direct the entry of a final judgment as to one or

more but fewer than all of the claims or parties only upon an express determination by the court that there is no just reason for delay and upon an express direction for the entry of judgment.

the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233 [65 S.Ct. 631, 633, 89 L.Ed. 911] ... (1945). 9 Moore's Federal Practice ¶ 110.08.

*Acha v. Beame,* 570 F.2d 57, 62 (2nd Cir. 1978).[5] Thus, "where liability has been decided but the extent of damage remains undetermined, there is no final order" for purposes of appellate review. *Sun Shipbuilding & Dry Dock Co. v. Benefits Review Board, United States Department of Labor,* 535 F.2d 758, 760 (3rd Cir.1976). This is also the case where the trial court's order disposes of a request for declaratory relief but leaves unresolved other equitable and legal claims for relief. *Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 742, 96 S.Ct. 1202, 1205, 47 L.Ed.2d 435 (1976); *accord In re Martin-Trigona,* 763 F.2d 135, 138–39 (2nd Cir.1985).

In the present case, the court granted the declaratory and injunctive relief requested by all plaintiffs, but specifically reserved the questions of entitlement to a tax refund for later determination. The reservation of that issue means that the underlying claim for relief has not been wholly disposed of as to any of the parties who have sought a refund under the amended complaint. *See* n. 1, *supra.* Therefore, we dismiss the appeal as to all of the individual plaintiffs who seek tax refunds as part of their requested relief. As to the Utah Taxpayers Association, which cannot recover monetary damages on behalf of its members, *id.,* the order is final because it wholly disposes of the Association's claim. That portion of the appeal is properly before us.[6]

■ We turn to the merits. The issue is whether the District, in creating a line item reserve fund and then using that fund for unexpected contingencies,[7] acted in excess of its authority. When it enacted section 53–20–2 of the Code, the legislature authorized the District "to adopt a budget containing an amount known as the undistributed reserve." The trial court found that the disputed line item reserve adopted by the District was a funded reserve above and beyond the reserve authorized by section 53–20–2. The District contends that the line item reserve at issue was not a funded reserve at all, but merely an accounting method used to facilitate the processing of uncertain revenues.

In reviewing a trial court's finding of fact, this Court considers the evidence in the light most favorable to the trial court.

**5.** As we acknowledged in *Pate v. Marathon Steel Co.,* 692 P.2d 765 (Utah 1984), Rule 54(b) of the Utah R.Civ.P. is "modeled after and is identical in all material respects to [Rule 54(b) of the Fed.R.Civ.P.]." *Id.* at 767. Therefore, we rely heavily upon decisions under the federal rule to explain the operation and underlying rationale of our Rule 54(b). *Id.*

**6.** The dissent suggests that we still lack jurisdiction because the state superintendent of schools signed an affidavit endorsing the practice of maintaining an undistributed reserve in addition to the single statutorily authorized reserve. Under U.C.A., 1953, § 53–3–4, as it existed at the time this case was commenced, the superintendent could, upon request from a district superintendent or other school official, issue written opinions on questions of school law, and such opinions were to be binding until set aside by a court of competent jurisdiction or by subsequent legislation. (*See* Repl.Vol. 5B, 1981, Supp.1985.) The dissent argues that because an opinion was issued by the state superintendent, that opinion is the only proper subject of re-view; and because the state superintendent is not properly before this Court and the opinion was not attached in the complaint, we lack jurisdiction to proceed. We respectfully disagree.

The complaint was filed on July 20, 1981. Summons was served on the following day. A temporary restraining order against the District was entered on July 21, 1981. Over a week later, on July 29, 1981, the state superintendent's affidavit was signed and submitted to the district court, apparently in support of the District's motion to dissolve the restraining order. Thus, the superintendent's so-called "opinion" was not a formal administrative response to a school administrator's inquiry, as contemplated by section 53–3–4. Rather, it was an after-the-fact affidavit prepared at counsel's request for litigation. Whatever the legislature intended in passing section 53–3–4, it certainly cannot have meant for that statute to be used to cover everything the superintendent might say at any time about school law in any forum.

**7.** *See* n. 3, *supra.*

If the finding has substantial record support, it will not be disturbed. *Charlton v. Hackett*, 11 Utah 2d 389, 390, 360 P.2d 176 (1961); *Piacitelli v. Southern Utah State College*, 636 P.2d 1063, 1067 (Utah 1981). In this case, we have reviewed the record and find substantial support for the trial court's factual determination that the line item reserve was a funded reserve used to cover the costs of unexpected contingencies.

■ The trial court next concluded that the legislature intended the statutory reserve to be the exclusive repository for monies set aside to cover unexpected contingencies and that use of the nonstatutory reserve for unexpected contingencies was therefore unlawful. The District objects, contending that nothing in either the explicit wording of the statute or the legislative history indicates that the statutory reserve is to be exclusive. The District also argues against an interpretation of exclusivity by highlighting its maintenance of various other reserves for specific purposes, notably for self-insurance and inventory, which the District claims are indistinguishable from the contested line item reserve.

The District accurately points out that section 53–20–2 does not explicitly state that a school district may establish only one undistributed reserve. The statute provides, however, that the statutory reserve "shall not exceed five percent of the [district's] maintenance and operation budget. . . ." The imposition of an upper limit on the reserve evidences a legislative intent to authorize but a single undistributed reserve. If a school district could establish multiple reserves to meet unexpected contingencies with unlimited funds in each, the express upper ceiling on the statutory reserve would be rendered meaningless because a school district could circumvent that limit simply by establishing a second,

nonstatutory reserve. We cannot presume that the legislature intended such a result.[8]

The legislative history also supports the conclusion that the legislature intended to authorize the establishment of only one reserve to meet unexpected contingencies. The undistributed reserve fund was first authorized by the legislature in 1971. 1971 Utah Laws ch. 129. In the legislative debate preceding passage of the amendment, Senator MacFarlane, one of the bill's co-sponsors, stated that the amendment was necessary to provide statutory authority for school districts to maintain any undistributed reserve fund at all. Debate SB No. 115 (Feb. 24, 1971). If the legislation was designed to formalize a district's limited authority to maintain such reserves, which authority was ambiguous before the bill's passage, then, the logical implication is that the statutory reserve is an exclusive one. *Cf.* 2A *Sutherland's Statutory Construction* § 47.23 (4th ed. 1984).

Perhaps most important in defining legislative intent, however, is the rationale underlying the authorization of an undistributed reserve. We are persuaded that the dominant purpose of the statutory reserve is the restoration of sound practices to school district budgeting. Prior to receiving statutory authorization to establish reserves, school districts resorted to padding individual segments of the budget to cover unknown future costs. This practice not only reduced the pressure on districts to carefully estimate their needs when preparing an itemized budget, but also effectively rendered the true budget inaccessible to public scrutiny. This state of affairs was expressly mentioned during the debate on the bill authorizing the reserve. Debate, SB No. 115 (Feb. 24, 1971). By providing for an exclusive reserve fund, the statute encourages more careful and accountable budgeting. This is the crux of the matter.

---

8. Contrary to the dissent's suggestion, we do not hold that the District may not maintain reserves for specific purposes. Our decision addresses only the issue of the District's authority to create multiple funded reserves for unexpected and unspecified contingencies. Specific reserves for identified line items would not violate the legislative policy of section 53–20–2 because the need for such reserves can be fully evaluated and reviewed in the normal budgetary process. Therefore, today's ruling in no way undermines the legality of reserves for inventory, self-insurance, etc.

To permit a school district to maintain an additional reserve and use it for unexpected contingencies would undermine this intention of the legislature.[9] We therefore hold that the undistributed reserve authorized by section 53–20–2 is the exclusive reserve authorized to meet unexpected and unspecified contingencies, and that the District exceeded its statutory authority in establishing an additional line item reserve which it used for unexpected contingencies.

Finally, the District contends that the mandatory injunction requiring them to make expenditures from the statutory undistributed reserve is an improper remedy because it amounts to judicial interference with the District's right to tax, which interference is prohibited by section 59–11–10 of the Utah Code. U.C.A., 1953, § 59–11–10 (Repl.Vol. 6B, 1974). We disagree.

While it is well settled that mandamus may not issue to compel a public official with unlimited discretion to act in a certain way, courts have long recognized that where the law imposes limitations on the exercise of that discretion, mandamus is available to enforce those limitations. *See* 52 Am.Jur.2d *Mandamus* § 79 at 401 (1970). Section 53–20–2 restricts the District's discretion in budgeting for unexpected contingencies. If the District acts within the limits of discretion conferred on it by law—that is, if it creates an undistributed reserve that meets the requirements of section 53–20–2—mandamus will not issue. But, where, as here, the District exceeds its statutory authority, mandamus provides appropriate relief. *See Huidekoper v. Hadley,* 177 F. 1, 9 (8th Cir.1910).

Affirmed.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, Justice (dissenting):

I submit that this case should be dismissed because the plaintiffs failed to join the State Superintendent of Public Instruction as a party defendant. I also believe that the majority errs in its construction of U.C.A., 1953, § 53–20–2 (Repl.Vol. 5B, 1981 ed., Supp.1985), and that the effect of the majority's statutory construction will be to hamstring the budget-making procedures of the school districts, perhaps to the point of adversely affecting their ability to borrow money at the lowest possible rates.

I.

Neither the trial court nor this Court have any jurisdiction over this dispute because of the failure of the plaintiffs to name the State Superintendent of Public Instruction as an indispensable party defendant. Under the statutory scheme established by the Legislature, the State Superintendent of Public Instruction, an indispensable party, had the authority to review the budgetary procedures of the school districts and to determine whether they complied with the law. Section 53–3–4 stated that the State Superintendent's "decisions [concerning the school law] shall be held to be correct and final until set aside by a court of competent jurisdiction or by subsequent legislation." Although this provision has now been repealed, it was in effect at the time of the proceedings in the lower court and when the challenged acts occurred. *See* Laws of Utah 1985, ch. 231, p. 628, amending § 53–3–4 to delete the above-quoted language.

Pursuant to § 53–3–4, the Superintendent of Public Instruction filed an affidavit, stating:

After reviewing § 53–20–2 Utah Code Ann. (1953), it is my opinion that the Salt Lake City school district's budgetary actions and fiscal policies regarding the handling of fund balances and undistributed reserves have been in compliance with § 53–20–2 Utah Code Ann. (1953), during each year since the 1976–1977 school year until the present.

**9.** The dissent suggests that our decision will have a negative effect on bond ratings of school districts. It is difficult to discern how the promotion of sound budgeting procedures can have anything other than a *positive* impact upon bond ratings of the effected school districts.

In my view, the State Superintendant's opinion is both "correct" and "final" under § 53–3–4 and not subject to judicial review because he was not made a party to the proceeding.

## II.

The Court's resolution of the substantive issue in this case, the meaning of U.C.A., 1953, § 53–20–2 (Repl.Vol. 5B, 1981 ed., Supp.1985),[1] reads a term into the statute that is not there and ignores the realities of financing a school district's operations. Section 53–20–2 provides that school districts may allocate up to 5% of their maintenance and operation budgets to an "undistributed reserve." The State Board of Education is required to fix the actual percentage for each school district. The percentage it has fixed for the Salt Lake City School District is 1½% of its maintenance and operation budget. Section 53–20–2 says nothing at all about line item reserves or their use.

The legislative purpose in enacting § 53–20–2 is clear on the face of the statute. It was to insulate a portion of a school board's budgeted funds from the contract negotiations for teachers' salaries, the largest single noncapital expense in a district's budget. Under the statute, "undistributed reserve" monies are not on the bargaining table in the negotiation of teachers' salaries. Experience has demonstrated that when a school district budget has set aside funds for contingencies, salary negotiators tend to draw those monies into the bargaining process, thereby threatening the soundness of the district's budget. By excluding the "undistributed reserve" from the bargaining process, which always occurs after the budget has been fixed in June of each year, the statute assures that the school district will have the full amount of the contingency funds, especially for the purpose of offsetting an unexpected decline in revenues during the fiscal year, but also possibly to cover unanticipated increases in expenses.

Section 53–20–2 does not state that the "undistributed reserve" is the only fund that can be used for nonline item contingencies. That, however, is what the majority holds, with no support whatsoever in the language of the statute, even though the plaintiffs' own expert witness conceded that sound budget-making required line item reserves in addition to the undistributed reserves. It is of no consequence that the Salt Lake City School Board has used line item contingency funds for some purpose other than the line item expense specified. No one has alleged in this case that the Board has misused one penny of public funds. Yet the plaintiffs seek a refund of taxes from the Board because of a budgeting practice which is sound and reasonable on its face and which the State Superintendent of Public Instruction has expressly found to be lawful.

The majority contends that the statutory limitation on the amount of the undistributed reserves implies that there can be only one budgeted reserve account for unforseen contingencies and that line item reserves cannot be used for any purpose other than meeting an under-budgeted line item expense, such as salaries or maintenance. In effect, the majority opinion ignores the realities that school districts are prohibited by law from spending more money than they take in, and that a deficit may occur either because of underestimated expenses or overestimated revenues. A degree of flexibility in budgeting is therefore essential. A school district cannot be run like a commercial business. If there is a 10% shortfall in the tax revenues, or a 10% increase in heating and snow removal expenses because of an unusually cold winter, for example, the district cannot cut expenses by cutting production by 10%, i.e., refuse to teach 10% of the pupils in the district. Finally, it should be noted that conservative accounting practices are important factors in the ultimate determina-

---

1. Section 53–20–2 was repealed by the Legislature in 1986. However, the substantive portion at issue herein was reenacted as § 53–20–2.3. Since § 53–20–2 was in effect at the time of this case, I refer herein to § 53–20–2.

tion of what interest rate a district, and its taxpayers, must pay to borrow money, when that becomes necessary. If contingency funds are insufficient to cover debt service, should there be a shortfall, the taxpayers will have to pay additional taxes to pay unnecessary interest charges.

The district in this case is not guilty of "padding," as the majority suggests might happen. Perhaps the district would have been better advised to have sought a high-er limit for the contingency reserve rather than doing as it did, but the State Superintendent of Public Instruction saw nothing wrong with the practice and that should be the end of the matter.