2017 UT App 75

## THE UTAH COURT OF APPEALS

RICHARD SPECHT,
Appellant,
*v.*
BIG WATER TOWN, PAUL HYDE, AND DEBBIE HYDE,
Appellees.

Opinion
No. 20150775-CA
Filed May 4, 2017

Sixth District Court, Kanab Department
The Honorable Wallace A. Lee
No. 040600075

Bruce R. Baird and Dallis Nordstrom Rohde,
Attorneys for Appellant

Jeremy G. Knight and S. Spencer Brown, Attorneys
for Appellees

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

TOOMEY, Judge:

¶1     Richard Specht challenges a land use variance and the
vacation[1] of a cul-de-sac in Big Water (the Town), which the

---

1. In the land use context, the term "vacation" is defined as "a
termination of the public interest in a street or highway by
formal or positive action of the public authority." *Private
Easement in Way Vacated, Abandoned, or Closed by Public*, 150
A.L.R. 644 (1944). We note that a vacation may affect only a part
of a road, plat, or subdivision. 11 McQuillin, *Municipal
Corporations* § 30:188 (3d ed. 2010). Both parties refer to the
vacation as a "reduction" in their briefing. Although the terms

(continued…)

Town's Board of Adjustment (the Board) and Town Council (the Council) granted in favor of Specht's neighbors, Paul Hyde and Debbie Hyde (the Hydes). Specht appeals the district court's order denying his motion for summary judgment and granting the Hydes' cross-motion for summary judgment. Specht makes two principal arguments. First, he argues the variance was arbitrary, capricious, and illegal because the Board did not make findings as to each of the required conditions of a variance and did not have substantial evidence to support its decision to grant it. Second, Specht contends the cul-de-sac vacation was arbitrary, capricious, and illegal because the Council did not have good cause to support it and did not provide proper notice of its hearings. We affirm.

BACKGROUND

¶2     The Hydes own two adjoining lots, lots 9 and 10, at the end of the Rose Garden cul-de-sac in Big Water, Utah. Each lot is smaller than one quarter of an acre.

*The Variance*

¶3     In July 2004, the Hydes applied for a building permit to construct a house on lot 9. One week later, they applied for a variance to decrease the rear yard setback requirement on the lot from twenty feet to ten feet to ameliorate the steep downhill grade from the cul-de-sac to their lot and to provide room to install a septic tank. In their variance application, the Hydes explained that, unlike the other lots in the Rose Garden cul-de-sac, theirs was ten feet below the cul-de-sac. They stated that the requested variance would not be contrary to the public interest

---

(…continued)
are seemingly interchangeable, we refer to the action as a vacation because that is how it is referred to in the Utah Code. *See, e.g.*, Utah Code Ann. § 10-9a-608 (LexisNexis 2015).

or substantially affect the area's master plan, because there were no neighbors to the rear of their lot and it could not be seen from the main road.

¶4 In its July 20, 2004 meeting, the Board granted the Hydes' variance application. In making its determination, the Board considered the variance application, a proposed plat map of the cul-de-sac with the smaller setback and with the vacation of a portion of the cul-de-sac, a letter from the health department, the applicable zoning ordinances, and statements made during the meeting. At the opening of the meeting, the Board recognized it could not grant the variance unless it met all five conditions required for a variance under the law. *See infra* ¶ 23. It proceeded to hear testimony about the lot and discuss whether the Hydes qualified for a variance.

¶5 According to the meeting minutes, the Hydes stated that when they bought the lot, it was six feet below the cul-de-sac at about a 5% grade, but a neighbor later raised the cul-de-sac by four feet. This alteration significantly increased the slope, limiting access to the Hydes' lot. They explained that decreasing the setback by ten feet and reducing the diameter of the cul-de-sac would allow them to build a driveway with an 8% grade. The Board observed that although each of the cul-de-sac lots covers less than one quarter of an acre, most of the other lots in the zoning district are half-acre lots.

¶6 As the Hydes indicated in their variance application, they needed the variance, in part, to install a septic system on their lot. The Board discussed this at the meeting and asked if the small size of the lot prevented them from installing a septic system. The Hydes reported that the lot was not too small for a septic system and submitted a letter from the health department to that effect.[2] The Board noted the Hydes needed such a system.

_____

2. The letter from the health department discussing the septic system was not included in the administrative record.

The Hydes explained the variance would enable them to install the septic system without encroaching on neighboring land owned by the Utah School and Institutional Trust Lands Administration.

¶7     The minutes reflect that the Board audibly read each of the five conditions required of a variance. *See infra* ¶ 23. It emphasized again that, unlike the Hydes' lot, most of the lots in the zoning district were half-acre lots and did not have a problem with the setback requirements: "The setbacks [were] designed for half-acre lots. So that makes it a hardship to abide by the setbacks . . . ." The Board asked if granting the variance would be harmful to other property owners in the area, and whether it would "go against the whole future development of the community." It recognized that the applicant must not be the one who created the hardship and that the hardship must not be common to other properties in the area. The Board determined that the Hydes did not create the hardship in this case; rather, it was caused by the neighbor who had raised the cul-de-sac and limited the Hydes' access to their property. After discussing the five conditions, the Board reached a unanimous decision to grant the variance because the Hydes' application met "all the requirements for the variance."

*The Vacation of the Cul-de-sac*

¶8     In January 2004, the Hydes requested vacation of a portion of the cul-de-sac. The Town's Planning and Zoning Committee (the Committee) directed them to hire a certified surveyor to redraw the plat with the proposed changes before it would consider their request. In August 2004, the Committee considered the Hydes' request at its regular meeting, and they presented a rendering of the plat with the proposed vacation. They explained that reducing the cul-de-sac's 100-foot diameter to a 60-foot diameter would mitigate the steep slope of their driveway because it would give them more space to grade it. They also noted that the vacation would provide enough space to allow another neighbor to park a vehicle on his property

rather than on the street. Specht also spoke and mentioned that one of the reasons he bought his property was because of the wide cul-de-sac, which made it easy to turn around.

¶9 After hearing from the Hydes and Specht, one committee member moved to recommend approval of the vacation to the Council. The Committee was split on its recommendation, with two members voting to recommend the vacation and two voting against it. The Committee announced that the Council would hold a public hearing on the request.

¶10 On August 20, 2004, the Town posted, in three separate public places, notice of the Council's public hearing set for September 21, 2004. The notice announced that the Council would hear questions and comments regarding "[a] petition to vacate the diameter of the [Rose Garden] cul-de-sac."

¶11 According to the Council hearing minutes, a council member spoke about the vacation and noted that the Town's zoning ordinance allowed a cul-de-sac to have a diameter as small as 60 feet. She stated that after inspecting the cul-de-sac, she did not see a problem with reducing it and that "[u]nless there [was] compelling evidence from adjoining property owners," the Council should support the vacation. The Council then opened the hearing for public comment. Specht was the first to comment. He displayed some pictures of a truck delivering cinderblocks to a property on the cul-de-sac and explained that the truck could not turn around there. According to Specht, all of the lots in the cul-de-sac sat on a hill, and therefore, the Hydes were not alone in dealing with that issue. Specht also asserted that Kane County and the "national code" do not allow a cul-de-sac to be as small as 60 feet in diameter.

¶12 After Specht finished, Mr. Hyde commented. He said that it was Specht who raised the elevation of the cul-de-sac, which now sat four and a half feet higher than when the Hydes purchased their property. According to Hyde, Specht "brought in load after load of any kind of material he could get his hands

on," such as "broken up concrete, broken up asphalt, [and] river boulders," to elevate the cul-de-sac. Hyde explained that as a result, the Hydes' driveway was on a 14% grade but with the variance and the vacation, they could lower it to an 8% grade, "which is still steep but . . . workable." Hyde added that he had spoken with "every emergency agency that might be entering [the] cul-de-sac" and none of the agencies objected to the vacation. Hyde finished by reiterating that he and his wife requested the vacation to "obtain reasonable access to their property," which they did not have because of a condition that Specht created.

¶13　Another resident commented that he wished the Town would "stick to what [was] drawn out." Mrs. Hyde responded by explaining that "[w]hen they bought the property, they did not have a problem with the size of the cul-de-sac" and that the building up of the cul-de-sac created the need for a vacation. She was the last to comment. At the close of the hearing, all five members of the Council voted to approve the vacation.

¶14　At its January 2005 public hearing, the Council officially approved the vacation by amending ordinance 2004-233. The amendment provides that "[t]he Town Council has found good cause for vacation of a portion of the cul-de-sac" and that "this vacation will not be detrimental to the general interest" of the Town.

*District Court Review*

¶15　In October 2004, Specht petitioned the district court to review the Board's and the Council's decisions, claiming the decisions were arbitrary, capricious, and illegal. The petition named the Town but did not identify the Hydes as respondents.[3]

---

3. Specht characterized the petition as a "Complaint/Petition for Review" and listed the Town as a defendant rather than a respondent.

Specht filed a motion for summary judgment, and the Town filed a cross-motion for summary judgment. Specht made three arguments. First, he argued the Town's issuance to the Hydes of a building permit for the construction of their house was illegal because their quarter-acre lot did not meet the Town's zoning requirement that lots be a minimum size of one half acre. Second, Specht argued the variance was arbitrary and capricious because it was not supported by substantial evidence. Third, Specht argued the vacation was illegal because the Town did not provide proper notice of the Planning and Zoning meeting or the Council hearing. The court granted Specht's motion and ordered the Town "to require the Hydes to combine their lots in compliance with Utah State law to bring their lots into compliance with the Zoning Ordinance." The court found there was substantial evidence to grant the variance but concluded it was illegal because the Hydes' lot did not meet the zoning requirement. Although the court found that the Town complied with the notice requirement that it "post such notice for four consecutive weeks in three public places in that municipality," it concluded the vacation was illegal because the Town did not prove that Specht and other affected neighbors received proper notice as Utah law required.

¶16 In December 2006, the Town filed a rule 60(b) motion for relief from the district court's order of summary judgment. *See* Utah R. Civ. P. 60(b). In its motion,[4] the Town explained that it had inadvertently overlooked a provision of its code governing non-conforming lots, which permitted the Hydes to obtain the

---

4. The Town's memorandum in support of its motion was not included in the appellate record and has since been destroyed pursuant to the district court's ordinary recordkeeping practices. Although the memorandum does not appear in the record, the Town's arguments are found in its reply and mentioned in Specht's memorandum in opposition.

necessary permits to build on their lot.[5] The Town argued the district court should vacate the order of summary judgment because the order "would require [the Town] to make a good faith—but likely futile—effort to require the Hydes to combine their lots and not enjoy the benefit of the zoning ordinance's [non-conforming lots] provision." As to vacation of the cul-de-sac, the Town argued that newly discovered evidence suggesting the Town provided proper notice to Specht and other affected neighbors was sufficient for the court to conclude that the Town complied with the notice requirements. In the alternative, the Town argued the new evidence created a genuine dispute as to whether the Town complied with the notice requirements, and therefore summary judgment on that issue was inappropriately granted. The court summarily granted the Town's motion and vacated its order granting Specht summary judgment. It is unclear upon which ground the court vacated its order.

¶17 While the Town's rule 60(b) motion was pending, the Hydes intervened in the action. After several more years of litigation and after the parties stipulated to the administrative record for the district court to review, Specht again moved for

---

5. Section 1408 of the Town's zoning ordinance provides in relevant part:

> Any legal lot or parcel of land . . . shall be eligible to be used for one (1) single family dwelling . . . even though such lot or parcel does not conform with the regulations of this Ordinance for the zoning district in which it is located, provided that such lot or parcel of land is located in a Zoning District which permits single family dwellings and provided further that all proposed construction can qualify for the issuance of a building permit as required by the Building Code.

Big Water, Utah, Zoning Ordinance § 1408 (2004).

summary judgment. In response, the Hydes, acting pro se, filed a cross-motion for summary judgment.

¶18   In his motion for summary judgment, Specht made the same arguments that he makes on appeal. He argued the variance was illegal because the Board did not make all of the necessary statutory findings and the Board's decision was not supported by substantial evidence. Specht also argued the vacation was illegal because the Town did not provide proper notice of the Planning and Zoning meeting and the Council's hearing, there was no good cause for granting the vacation, and Specht was materially harmed by the vacation. In their cross-motion, the Hydes argued the Board's decision was supported by substantial evidence and it "followed all legal requirements to grant [the] variance." They further argued that the Council properly granted the vacation, which did not harm Specht, and that the Town complied with all notice requirements.

¶19   After oral argument on the motions for summary judgment, the district court issued a memorandum decision and order in which it denied Specht's motion and granted the Hydes' cross-motion. The court noted the Board "heard from citizens and from Mr. and Mrs. Hyde" and "reviewed the applicable plat map and a letter from the health department." The court concluded that "this evidence qualifies as substantial evidence because it is relevant, relates to standards for granting a variance, and is credible." The court further explained that "[a]lthough the findings of the board are oral findings, memorialized in minutes of the meeting, and by no means perfect, the Court finds they are sufficient for the Court to conclude the board carefully considered and wrestled with the evidence both favorable and contrary to the requested variance." In reaching its decision on the vacation, the court first addressed whether the Council's decision was a legislative act or an administrative act. The court concluded the Council's decision to grant the vacation was an administrative act "because it did not create new law, but merely executed or implemented existing law," and under Utah law, Specht was required to exhaust his

administrative remedies before he could petition the district court for review. The court found that Specht did not exhaust his administrative remedies and therefore it lacked jurisdiction to review the Council's decision to grant the vacation. Specht appeals.

ISSUES AND STANDARDS OF REVIEW

¶20    Specht raises two issues on appeal. First, he contends the variance was arbitrary, capricious, and illegal because the Board did not make findings as to all the conditions required of a variance and the findings it did make were not supported by substantial evidence. Second, Specht contends the cul-de-sac vacation was arbitrary, capricious, and illegal because there was no good cause for allowing it, it caused material injury to Specht and other property owners, and the Council did not provide proper notice of its hearing to consider it.

¶21    "When a lower court reviews an order of an administrative agency and we exercise appellate review of the lower court's judgment, we act as if we were reviewing the administrative agency decision directly and do not defer, or accord a presumption of correctness, to the lower court's decision." *Carrier v. Salt Lake County*, 2004 UT 98, ¶ 17, 104 P.3d 1208 (citation and internal quotation marks omitted). We do, however, presume that the final decision of the administrative agency "is valid—i.e., not arbitrary or capricious—so long as it is supported by substantial evidence." *See Vial v. Provo City*, 2009 UT App 122, ¶ 9, 210 P.3d 947 (citation and internal quotation marks omitted).

¶22    "On the other hand, whether or not the [administrative agency's] decision is illegal depends on a proper interpretation and application of the law," and in this regard, we accord no deference to the administrative agency. *See Vial*, 2009 UT App 122, ¶ 9 (citation and internal quotation marks omitted).

ANALYSIS

I. The Variance

¶23    The Hydes applied to the Board for a variance from the rear yard setback requirement to reduce the steepness of their driveway and thus provide them with reasonable access to their property. Under Utah law, the Board could not grant the variance unless it found that

> (i) literal enforcement of the ordinance would cause an unreasonable hardship for the applicant that is not necessary to carry out the general purpose of the land use ordinances;
> (ii) there are special circumstances attached to the property that do not generally apply to other properties in the same zone;
> (iii) granting the variance is essential to the enjoyment of a substantial property right possessed by other property in the same zone;
> (iv) the variance will not substantially affect the general plan and will not be contrary to the public interest; and
> (v) the spirit of the land use ordinance is observed and substantial justice done.

Utah Code Ann. § 10-9a-702(2)(a) (LexisNexis 2015).[6]

¶24    Specht argues that granting the variance was illegal because the Board did not find all five conditions specified by

---

6. Although the variance and the vacation were granted in 2004, for ease of reference, we cite the relevant statutes to their most recent codifications in the Utah Code unless the statute has since been repealed or amended to such an extent as to alter its meaning.

the Utah Code. Specht further argues the Board's decision to grant the variance was arbitrary and capricious because it was not supported by substantial evidence and the district court erred in upholding it.[7] We address these two claims together.

¶25 The parties stipulated to the administrative record the district court reviewed in granting the Hydes' cross-motion for

_____

7. The Town and the Hydes contend Specht has failed to adequately "marshal all record evidence that supports the challenged finding[s]," *see* Utah R. App. P. 24(a)(9), and imply that this failure should result in procedural default. Our supreme court has clarified the contours of the marshaling requirement:

> [W]e now conclude that the hard-and-fast default notion of marshaling is more problematic than helpful—particularly when compounded by the heightened requirements of our caselaw (to present "every scrap" of evidence and to play "devil's advocate") and our retention of discretion to disregard a marshaling defect where we deem it appropriate.

> We therefore repudiate the default notion of marshaling sometimes put forward in our cases and reaffirm the traditional principle of marshaling as a natural extension of an appellant's burden of persuasion. Accordingly, from here on our analysis will be focused on the ultimate question of whether the appellant has established a basis for overcoming the healthy dose of deference owed to factual findings and jury verdicts—and not on whether there is a technical deficiency in marshaling meriting a default.

*State v. Nielsen*, 2014 UT 10, ¶¶ 40–41, 326 P.3d 645. In light of this clarification, we have decided to reach the merits of Specht's argument.

summary judgment. The record is thin, just fifty-nine pages. In reviewing the Board's decision, we likewise limit our analysis to the administrative record to which the parties stipulated and do not consider anything outside of it. *See Patterson v. Utah County Board of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App. 1995). We note that Specht's brief relies on a transcript of the Board's meeting during which it granted the variance. But the administrative record the parties agreed on does not include this transcript; instead, it includes the minutes of the meeting.[8] Specht also relies on depositions taken from Mr. Hyde and a Town official that are not part of this record. Because the transcript and the depositions are not part of the stipulated administrative record, we do not consider them in rendering our decision.

¶26    In *Wells v. Board of Adjustment of Salt Lake City Corp.*, 936 P.2d 1102 (Utah Ct. App. 1997), we reviewed the decision of the Salt Lake City Board of Adjustment (the SLC Board) concerning a restaurant's application for a variance from a zoning ordinance that required the restaurant to landscape its rear yard. *Id.* at 1103. There, the SLC Board granted the restaurant's variance and submitted a written order with only one finding: that "the neighborhood would be better served" by granting the variance. *See id.* at 1103–04 (internal quotation marks omitted). Residents of the adjoining neighborhood opposed the variance and sought review of the SLC Board's decision in district court. *Id.* The

---

8. The Board was legally obligated to provide the district court with "the record of its proceedings including its minutes, findings, orders and, if available, a true and correct transcript of its proceedings." Utah Code Ann. § 10-9a-801(7)(a) (LexisNexis 2015). We emphasize that the Board was not required to "have its proceedings contemporaneously transcribed by a court reporter or a tape recorder." *Id.* § 10-9-702(4)(c) (LexisNexis 2003) (repealed 2005). Considering the Board's meeting transcript later became available, it is unclear why Specht stipulated to an administrative record that did not include it.

district court considered the SLC Board's order, a transcript of its meeting, and other evidence before it. *Id.* at 1104. The court granted summary judgment in favor of the SLC Board, and the residents appealed. *Id.* They made the same arguments that Specht makes here—namely, that the SLC Board's decision was not supported by substantial evidence and was therefore arbitrary and capricious, and the decision was illegal because the SLC Board did not make the required statutory findings. *See id.* at 1104–05.

¶27   The SLC Board and restaurant argued, however, that this court could "glean" or "divine" from the record that the SLC Board considered each of the conditions. *See id.* at 1105 (internal quotation marks omitted). But after reviewing the transcript of the SLC Board's meeting and its order, we "found *no evidence* that suggest[ed] the Board considered each of [the] statutory [conditions]" required for a variance. *Id.* (emphasis added). We also concluded that the SLC Board granted the variance without making the required statutory findings. *Id.* at 1104. Accordingly, we held that the decision to grant the variance was arbitrary and capricious because it was not supported by substantial evidence, and that the decision was illegal because the SLC Board failed to make all the required statutory findings. *Id.* at 1104–05.

¶28   Specht similarly claims the Board's decision to grant the variance was based on a single finding that the variance would do no harm and that the Board did not make findings as to each of the five conditions required for a variance under Utah Code section 10-9a-702(2)(a) (LexisNexis 2015). Specht urges us to conclude, as we did in *Wells*, that the Board acted illegally in granting the variance because it did not make all the necessary findings.

¶29   Although the Board's minutes indicate that it asked at the meeting whether granting the variance would "hurt anybody," Specht isolates this question and ignores the other evidence in the minutes demonstrating that the Board made all the statutory findings. Specht fails to mention that the Board made the

following findings: that "[t]he setbacks [were] designed for half-acre lots," which made it "a hardship to abide by the setbacks;" that the Hydes "did not create the hardship;" that unlike the Hydes' lot, most of the lots in the zoning district are half-acre lots that do not have a problem with the setback requirements; that the raised cul-de-sac limited the Hydes' access to their property; and that after discussing all five conditions, the Board moved to grant the variance because it met "all the requirements for the variance." In addition, Specht makes no mention of the evidence that the variance would aid the Hydes in installing a septic system, that the health department did not think the variance would "be a problem," or that the Board considered whether granting the variance would "go against the whole future development of the community."

¶30    This is far different from what occurred in *Wells*, where, after reviewing the administrative record, including a transcript of the SLC Board's meeting, we "found no evidence" that suggested the SLC Board considered each of the five conditions. *See* 936 P.2d at 1105. By contrast, at the outset of the Board's meeting in the present case, it stated that it could not grant the variance unless all five conditions were met. In addition, it was clear in *Wells* that the SLC Board did not make all the necessary findings because its written order included only one finding: that "the neighborhood would be better served" by granting the variance. *See id.* at 1104–05 (internal quotation marks omitted). Specht's claim that the Board likewise made only one finding is inaccurate. After reviewing the administrative record, we conclude the Board considered each of the five conditions for a variance and issued oral findings as to each one.

¶31    We now turn to Specht's claim that the Board's decision was arbitrary and capricious because it was not supported by substantial evidence. "[T]he Board's decision can only be considered arbitrary or capricious if *not* supported by substantial evidence." *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App. 1995). "Substantial evidence is that quantum and quality of relevant evidence that is adequate to

convince a reasonable mind to support a conclusion." *Vial v. Provo City*, 2009 UT App 122, ¶ 9, 210 P.3d 947 (citation and internal quotation marks omitted). To determine whether substantial evidence supports the administrative agency's decision, we "consider all the evidence in the record, both favorable and contrary to the [agency's] decision." *Id.* (citation and internal quotation marks omitted). "Nevertheless, our review, like the district court's review, is limited to the record provided by the [administrative agency]" and we "may not accept or consider any evidence outside the [agency's] record." *See Patterson*, 893 P.2d at 604.

¶32 The first condition required the Board to find that "literal enforcement of the ordinance would cause an unreasonable hardship for the applicant that is not necessary to carry out the general purpose of the land use ordinances." Utah Code Ann. § 10-9a-702(2)(a)(i) (LexisNexis 2015). Section 702 provides guidance on how a board of adjustment may determine whether the zoning ordinance would cause unreasonable hardship. "[T]he appeal authority may not find an unreasonable hardship unless the alleged hardship: (A) is located on or associated with the property for which the variance is sought; and (B) comes from circumstances peculiar to the property, not from conditions that are general to the neighborhood." *Id.* § 10-9a-702(2)(b)(i). In addition, "the appeal authority may not find an unreasonable hardship if the hardship is self-imposed or economic." *Id.* § 10-9a-702(2)(b)(ii).

¶33 During the Board's meeting, the Hydes presented evidence that, after purchasing their lot, a neighbor raised the cul-de-sac by four feet. This resulted in a very steep declining grade to their lot, which limited access to their property. Further, the Board recognized that, unlike most of the properties in the zoning district which sat on half-acre lots, the Hydes' lot sat, along with the other lots in the cul-de-sac, on less than one quarter of an acre. The Hydes also explained that the setback requirements and the existence of an abandoned well on the lot hindered their ability to install a septic system and a variance

would provide sufficient space to install it. The Board found that the small size of the Hydes' lot and the steepness of the grade from the cul-de-sac to their lot created a hardship, which the Hydes did not create themselves.

¶34 Specht argues this evidence is not substantial enough to support the Board's decision and that, because the other lots in the cul-de-sac were also less than one quarter of an acre, the Board could not have found that the hardship was peculiar to the Hydes.[9] We disagree. That all the lots in the cul-de-sac sat on less than one quarter of an acre did not undermine the Board's finding. The question of peculiarity is viewed in the context of the zoning district or neighborhood, not one street. *See id.* § 10-9a-702(2)(b)(i)(B). The Board found that most of the lots in the zoning district were half-acre lots that were not burdened by the setback requirements. We conclude that the Board's finding that enforcing the setback requirements would create an unreasonable hardship and that the hardship arose from circumstances peculiar to the property was supported by substantial evidence.

¶35 The second condition required the Board to find that "there are special circumstances attached to the property that do not generally apply to other properties in the same zone." *Id.* § 10-9a-702(2)(a)(ii). Section 702 further provides that "the appeal authority may find that special circumstances exist only if the special circumstances: (i) relate to the hardship complained of; and (ii) deprive the property of privileges granted to other properties in the same zone." *Id.* § 10-9a-702(2)(c).

---

9. Specht makes other arguments based on evidence that was elicited from Mr. Hyde in a deposition taken after the Board made its decision. Because the Board could not have considered this evidence and because it is not part of the administrative record, we do not consider these arguments. *See supra* ¶ 25.

¶36    Specht argues the Board's finding that there were special circumstances attached to the property was not supported by substantial evidence because "the need[] for a septic system and the existence of a well on the property [were] pre-existing conditions that were in place" when the Hydes purchased the property. But this has no bearing on satisfying the second condition. Specht further contends there is no evidence in the administrative record "that any of the other property owners needed a variance to construct their homes or install their septic systems." This cuts against Specht's position.

¶37    The Hydes' property was unique and its conditions prevented them from enjoying reasonable access and installing a septic system, unlike the other lots in the zoning district. In making its finding, the Board relied on evidence that the Hydes had only limited access to their property because their lot was much lower than other lots in the zoning district, that the Hydes' lot was smaller than most of the lots in the zoning district, and that the Hydes "needed [a] septic system, too." Other property owners in the zoning district enjoyed easy access to their lots, as well as ample space to install septic systems. Without a variance, the Hydes would have been deprived of similar privileges. We therefore conclude that the Board's finding as to the second condition was supported by substantial evidence.

¶38    The third condition required the Board to find that "granting the variance is essential to the enjoyment of a substantial property right possessed by other property in the same zone." Utah Code Ann. § 10-9a-702(2)(a)(iii) (LexisNexis 2015).

¶39    Specht does not specifically address this condition. The Town and the Hydes argue that the administrative record "demonstrates that other owners . . . were able to construct homes on single lots of a similar size, without being forced to construct unreasonably steep driveways," and that there was no evidence in the administrative record "that other lots in the area are similarly affected." We agree. In addition, there is no

evidence in the administrative record that the setback requirements hindered other property owners' abilities to install septic systems. We therefore conclude there was substantial evidence to support the Board's finding as to the third condition.

¶40 The fourth condition required the Board to find that "the variance will not substantially affect the general plan and will not be contrary to the public interest." *Id.* § 10-9a-702(2)(a)(iv).

¶41 As with the third condition, Specht does not specifically address this condition, but we conclude the Board's finding was supported by substantial evidence. The Hydes stated in their variance application that they had no rear neighbors who could be affected by the variance and that the lot cannot be seen from the main road because it sits below the cul-de-sac. The Hydes also stated at the Board's meeting that the health department did not believe the variance would be a problem and provided the Board with a letter from the health department. This evidence was sufficient to support the Board's finding.

¶42 Finally, the fifth condition required the Board to find that "the spirit of the land use ordinance is observed and substantial justice done." *Id.* § 10-9a-702(2)(a)(v). Once again, Specht fails to specifically address why the Board's finding was not supported by substantial evidence. The purpose of the Town's setback requirements is not clear from the record, but setback requirements are often used to control the density of land use, reduce traffic congestion, maintain the aesthetics of the neighborhood, and promote health and safety. 1 Patricia E. Salkin, *American Law of Zoning* §§ 7:6, 7:8–9, 7:13 (5th ed. 2008).

¶43 The Board heard evidence that the neighboring land to the rear of the Hydes' lot was owned by the Utah School and Institutional Trust Lands Administration, that their lot could not be seen from the main road, and that the Hydes needed the variance to reduce the steep decline grade of the driveway and to install a septic system. Granting the variance would not be contrary to controlling the density of the neighborhood or

lessening traffic congestion because there were no houses or roads abutting the Hydes' rear boundary. To the extent that the setback requirements had an aesthetic purpose, granting the variance would not frustrate that purpose because the Hydes' lot could not be seen from the main road. Finally, granting the variance would improve health and safety because it would allow the Hydes to install a septic system. For these reasons, we conclude the Board's finding was supported by substantial evidence.

¶44    In sum, there is ample evidence in the administrative record "to convince a reasonable mind" that the Board's decision to grant the variance met all five conditions required of a variance under the Utah Code. *See Vial v. Provo City*, 2009 UT App 122, ¶ 9, 210 P.3d 947 (citation and internal quotation marks omitted).

## II. Vacation of the Cul-de-sac

¶45    Before the Council could consider a vacation at a public hearing, the Town was required to ensure that notice was mailed to "each owner of property located within 300 feet of the property that is the subject of the proposed plat change." Utah Code Ann. § 10-9-809(1)(a) (LexisNexis 2003).[10] In addition, the Town was required to "give notice of the date, place, and time of the hearing by . . . posting the notice once a week for four consecutive weeks before the hearing in three public places in that municipality." *Id.* § 10-9-809(2)(b). The Council could not grant the vacation unless it was "satisfied that neither the public nor any person [would] be materially injured by the proposed

---

10. Section 10-9-809 has since been repealed but was the law at the time the Council considered the vacation, and we therefore apply it. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question.").

vacation . . . and that there [was] good cause" to grant it. *Id.* § 10-9-810(1)(b) (amended by *id.* § 10-9a-609(1) (LexisNexis 2015)).

¶46    The Hydes requested vacation of the Rose Garden cul-de-sac to allow more space to grade their driveway, thus alleviating its steep decline grade and providing them with "reasonable access" to their property. According to the Hydes, the variance and vacation would decrease the slope of their driveway from a 14% grade to an 8% grade. The Council was satisfied that the Hydes' request met the requirements of a vacation, notwithstanding Specht's objections, and unanimously approved it.

¶47    Specht argues the Council's decision is arbitrary and capricious because the vacation lacked good cause and it materially injured him and other residents. Specht next argues the Town acted illegally because it did not comply with the notice requirements.[11] Specht also argues the district court erred in characterizing the Council's decision to grant the vacation as an administrative, rather than legislative, action, which would have required him to exhaust his administrative remedies before seeking review of the Council's decision in district court. *See id.* § 10-9a-801(1) (LexisNexis 2015).

¶48    The Town and the Hydes argue the vacation is substantively valid. They also argue Specht lacks standing to argue that the Town failed to comply with any notice

---

11. Specht points out that there is no evidence in the record that the Hydes filed a petition seeking a vacation of the cul-de-sac and it was therefore inappropriate for the Council to consider the request. But the Hydes were not required to file a petition before the Council could consider their request. "[T]he legislative body . . . may, with or without a petition, consider any proposed vacation . . . of a subdivision plat . . . ." Utah Code Ann. § 10-9-808(1)(a) (LexisNexis 2003) (amended by Utah Code Ann. § 10-9a-608(1) (LexisNexis 2015)).

requirements because Specht attended and participated in both the Planning and Zoning meeting and the Council's public hearing discussing the vacation.[12]

¶49 To obtain judicial review of the Council's decision in district court, Specht first needed to be an "aggrieved party;" in other words, Specht needed to have standing. *See id.* § 10-9-810(2) (LexisNexis 2003) (amended by *id.* § 10-9a-801(2) (LexisNexis 2015)); *infra* ¶¶ 50–55. In addition, the court could not review the vacation unless it had jurisdiction. We conclude Specht lacks standing both to challenge the validity of the vacation and to challenge the Town's alleged failure to provide written notice to Specht and other neighbors living within 300 feet of the cul-de-sac. Because we conclude Specht lacks standing, we do not address the question of whether the Council acted administratively or legislatively and thus whether the district court had jurisdiction to review the vacation.

A.     Specht Lacks Standing to Challenge the Validity of the Vacation.

¶50 "In a proceeding to set aside a vacation order, a complainant should allege that . . . he has suffered special damages different in kind from the damage to the general public." *Sears v. Ogden City*, 572 P.2d 1359, 1362 (Utah 1977). Of importance to our case, "[i]f means of ingress and egress are . . . only rendered less convenient" by the vacation, a complainant does not suffer special injury. *Id.*

---

12. Although it appears the Town and the Hydes did not challenge Specht's standing in the court below, "lack of standing is jurisdictional," *Heath Tecna Corp. v. Sound Sys. Int'l, Inc.*, 588 P.2d 169, 170 (Utah 1978), and it may "be raised at any time by either party or by the court," *Olson v. Salt Lake City School Dist.*, 724 P.2d 960, 964 (Utah 1986).

¶51   In *Sears*, our supreme court considered an appeal by several Ogden residents challenging an Ogden City Council decision to vacate a portion of one of its streets. *Id.* at 1360–61. The residents argued the ordinance that approved the vacation was invalid, in part because the vacation "was not in the best interest of the general public." *Id.* at 1361. The court held that "the plaintiffs had no standing to challenge the ordinance" where "[t]here was no allegation or evidence of fraud or collusion," "[n]one of the plaintiffs [had] suffered a special injury different in kind to the public in general," and none of the plaintiffs' access to their property was "substantially impaired." *Id.* at 1362.

¶52   We acknowledge that *Sears* involved the vacation of a street as opposed to the vacation of a cul-de-sac and was governed by a different, albeit related section of the Utah Municipal Code.[13] But to challenge a vacation order, both statutory schemes—the scheme in effect at the time *Sears* was decided and the scheme in effect at the time Specht challenged the Council's decision—required that a complainant be an "aggrieved" party. Utah Code Ann. § 10-9-810(2) (LexisNexis 2003) (amended by Utah Code Ann. § 10-9a-801(2) (LexisNexis 2015)); *id.* § 10-9-15 (Allen Smith Co. 1973) (repealed 1992). Although our supreme court in *Sears* did not specifically

---

13. The applicable section of the Utah Code governing the vacation of a street at the time *Sears* was decided required the administrative agency to be "'satisfied that there [was] good cause for such . . . vacation'" and that it would "'not be detrimental to the general interest.'" *See Sears*, 572 P.2d at 1362 (omission in original) (quoting Utah Code Ann. § 10-8-8.1 (Allen Smith Co. 1973) (repealed 1992)). In comparison, section 10-9-810 required the Council to be "satisfied that neither the public nor any person will be materially injured . . . and that there is good cause for the vacation." Utah Code Ann. § 10-9-810(1)(b) (LexisNexis 2003) (amended by Utah Code Ann. § 10-9a-609(1) (LexisNexis 2015)).

interpret the term "aggrieved," it held that to have standing to challenge the validity of a vacation of a street, a complainant must suffer "special injury different in kind to the public in general." 572 P.2d at 1362. We likewise hold that a complainant lacks standing to challenge the validity of a vacation of a cul-de-sac where he has not suffered special injury different in kind from the injury to the public in general.

¶53    Like the plaintiffs in *Sears*, Specht has suffered only a minor inconvenience. At the Planning and Zoning meeting, Specht explained that the vacation would hinder his "ease of turning around" in the cul-de-sac. Later, at the Council's hearing, Specht did not complain that the vacation would directly harm him; rather, he contended that some vehicles would have a harder time turning around, evidenced by some photographs allegedly showing a large delivery truck having trouble turning around in the cul-de-sac. But at the Council's hearing, the Hydes stated they had spoken with "every emergency agency" and none of them were concerned with the sixty-foot-wide cul-de-sac. Moreover, in his brief, Specht contends that the vacation "negatively impact[ed]" him and other property owners. But "negative impact" does not rise to the level of special injury, and any minor inconvenience in turning around in the cul-de-sac is common to all drivers. Therefore, because Specht did not demonstrate that he suffered special injury different in kind from the public in general and his access to the cul-de-sac was not substantially impaired, he lacks standing to challenge the validity of the vacation.

B.    Specht Lacks Standing to Challenge the Town's Alleged Deficiencies in Providing Notice of the Council's Public Hearing.

¶54    Although a complainant must allege special injury when challenging the validity of a vacation order, he is not required to do so "where the right to relief is grounded on illegal acts of the council claimed to operate as a constructive fraud affecting the city and its citizens." *Sears v. Ogden City*, 572 P.2d 1359, 1362

(Utah 1977). To have standing, Specht needed "to show that he has suffered some distinct and palpable injury that gives him a personal stake in the outcome of the legal dispute." *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983). "It is generally insufficient for a [complainant] to assert only a general interest he shares in common with members of the public at large." *Id.* at 1148–49.

¶55 We conclude that Specht lacks standing to challenge the Town's alleged failure to provide him with written notice of the Council's hearing under Utah Code section 10-9-809(1)(a) (LexisNexis 2003) (repealed 2005).[14] Specht has suffered no injury related to the Town's alleged failure to provide proper notice. Specht attended and participated in both the Planning and Zoning meeting and the Council's hearing, demonstrating that he was aware of the gatherings. Not only did he attend and participate, but he was prepared to address the issues discussed, evidenced by documents and photographs. Even if Specht's claim that he did not receive written notice of the hearing is true,[15] he "has failed to adequately explain how the deficiencies in the notice inhibited his ability to respond." *See Hugoe v. Woods Cross City*, 2013 UT App 278, ¶ 9, 316 P.3d 979; *see also Roberts v. City of Detroit*, 216 N.W. 410, 412 (Mich. 1927) (holding that

---

14. Specht also complains that the Town did not provide proper notice for the Planning and Zoning meeting, but he has identified no law that required the Town to provide notice of this meeting.

15. We reiterate that it is unclear from the record whether the district court granted the Town's rule 60(b) motion and vacated its order granting Specht summary judgment on the vacation issue because it concluded the newly discovered evidence was sufficient to prove that the Town complied with the notice requirements or whether it concluded the newly discovered evidence presented a genuine issue as to a material fact, rendering summary judgment inappropriate. *See supra* ¶ 16.

plaintiffs could not complain of the city's alleged failure to provide them notice of a public hearing in which the city approved the vacation of a street, where plaintiffs were present and were "heard at every essential stage"); 8A McQuillin, *Municipal Corporations* § 25:269 (3d ed. 2010) (explaining that notice requirements "have been deemed to be waived by property owners who file written objections and attend the hearings on the proposal").

¶56 In sum, we conclude Specht lacks standing to challenge both the validity of the vacation and the Town's alleged failure to comply with the required notice provisions. Because Specht lacks standing, we do not reach the question of whether the Council acted administratively or legislatively in enacting the ordinance to vacate the Rose Garden cul-de-sac.

## CONCLUSION

¶57 The district court properly concluded the variance was not arbitrary, capricious, or illegal when it granted the Hydes' cross-motion for summary judgment. In addition, we conclude that Specht lacks standing to set aside the vacation. We therefore affirm the decision of the district court.

_____